## STATE v. LONGYEAR HOLDING COMPANY AND OTHERS. NORTH STAR MINING COMPANY OF WEST VIRGINIA AND OTHERS, APPELLANTS.[1]

August 8, 1947.

No. 34,336.

452

*Holmes, Mayall, Reavill & Neimeyer,* for appellants Longyear Holding Company and others.

*Arthur Roberts,* for appellants The Adams Corporation and C. M. Hill Lumber Company.

*Doherty, Rumble, Butler & Mitchell,* for appellant North Star Iron Company.

*J. A. A. Burnquist,* Attorney General, *William C. Green,* Assistant Attorney General, and *Mandt Torrison,* Special Assistant Attorney General, for the State.

*Francis E. Murphy* as *amicus curiae* filed a brief on behalf of the contention of appellants.

THOMAS GALLAGHER, JUSTICE.

Action by the state to determine adverse claims to the bed of Syracuse Lake, situated in sections 5 and 6, township 58 north, range 15 west, St. Louis county, Minnesota. The action involves only that portion of the bed of the lake below low-water mark, comprising approximately 33 acres, in which there are valuable iron ore deposits.

Defendants other than Lake Mining Company, which is operating under lease from the state, are the owners of all interests in the land bordering on said lake. For brevity, they are hereinafter referred to as the riparian owners.

Some 20 million tons of ore are involved, of which approximately 18 million tons lie under the lands bordering the lake to the low-water mark thereof and of which approximately two million tons lie under the lake bed below said low-water mark. It is the ownership of the latter which is involved in this action.

The state has entered into an agreement under statutory authority whereunder the lake has been drained, a temporary channel connecting the waters above and below it constructed, the overburden removed, and the mining of the ore deposits beneath the lake bed below its low-water mark commenced. Such operations have been undertaken and conducted under separate agreements with the riparian owners, so that the ore beneath their lands bordering said lake may be removed at the same time. All such operations are being conducted by Lake Mining Company under agreements with the riparian owners and with the state, whereunder specified royalties upon the ore removed from below said portion of the lake bed are to be paid to the lawful owners thereof as judicially determined, and whereunder, if required by the state, said lake is to be refilled and its channel restored when such operations are complete.

The trial court made findings and ordered judgment in favor of the state, in substance determining that Syracuse Lake at the time of Minnesota's admission to the Union was part of a navigable highway extending from the mouth of the St. Louis River to Lake of the Woods; hence that the state retained or reserved title to the bed thereof below low-water mark and now holds the same in its sovereign governmental capacity in trust for the people of the state, although not in absolute proprietorship with right of alienation; that the state is the owner of iron ores and other minerals on, in, or below said low-water mark of the lake, with the right to dispose of the same by lease, subject only to the prior lease and agreement held by Lake Mining Company, hereinbefore described; and that none of the riparian owners are entitled to receive or be paid any royalties or other compensation for the ore removed from said portion of the lake bed.

The only fact issue presented at the trial was whether Syracuse Lake was a navigable public lake within the federal tests of navigability at the time of Minnesota's admission to statehood, so that title to the bed thereof remained in the state upon such admission. The remaining issues were issues of law. The trial court found that Syracuse Lake was a navigable public lake within the federal tests of navigability at the time of Minnesota's admission to statehood, and, in our opinion, as will hereinafter be shown, the evidence amply sustained the trial court's findings in this respect.

In their written briefs and oral arguments, the riparian owners do not seriously question the sufficiency of the evidence to sustain this finding. It is their principal contention here, as it was at the trial, that, even though at the time of Minnesota's admission Syracuse Lake was part of a navigable waterway, nevertheless, *under the decisions of this court* rendered subsequent thereto, the state's title therein was thereafter limited to that of sovereign and governmental rather than proprietary; while their interests in said lake bed, *under our decisions,* were held to be proprietary and beneficial, subject only to the state's sovereign or governmental right therein; and that, since the state has effected the diversion of the waters of said

lake and provided a new channel in lieu thereof, its sovereign right to the lake bed no longer attaches thereto, and they alone, as holders of the proprietary interests therein, are now the lawful owners of the ore beneath the same.

The riparian owners acquired their original rights in the premises adjoining said lake by virtue of patents from the United States issued to them or their assignors or predecessors in interest. It is well established that if Syracuse Lake was part of a navigable watercourse at the time of Minnesota's admission to statehood title to the bed thereof, as well as to the bed of other navigable lakes and streams within the state, remained in the state and did not pass to the federal government, and that in consequence patents from the United States covering lands riparian thereto conveyed to the grantees therein no interest in the beds of such waters.

It would follow therefrom that any rights of riparian owners therein must arise by virtue of some action or proceeding taken subsequent to Minnesota's admission to statehood which divested or limited the state's beneficial interest in such lands and vested the same in the riparian owners. As stated above, the riparian owners assert that such transfer of beneficial ownership was effected by the *decisions of this court* subsequent to statehood. These, they assert, established a rule of property which divested the state of any beneficial or proprietary ownership in the beds under navigable waters and vested the same in them, effective when the state's sovereign interest therein terminated as the result of accretions and relictions, or by the complete drainage and diversion of such waters to a new channel, as in the instant case.

It is the contention of such riparian owners that the rule of property thus asserted is established in Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. R. 789; Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722; Shell v. Matteson, 81 Minn. 38, 83 N. W. 491; and State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139.

The state, on the other hand, contends that Syracuse Lake was part of a navigable waterway at the time of Minnesota's admission to the Union, and hence that title to the bed of the lake below the low-water mark was reserved to the state at such time and subsequent thereto; that such title so reserved, while designated at times as governmental or sovereign, nevertheless gave the state the full beneficial right, title, and interest in and to the bed of the lake below low-water mark; that decisions defining the state's rights in the beds of navigable waters as governmental or sovereign rather than proprietary mean only that the state cannot parcel and sell or otherwise alienate such water beds so as to interfere with commerce or the navigability thereof, but that it holds the same in trust for all the people for public navigation; that no decision of this court and no legislative enactment ever vested the beneficial title or ownership of said water bed in the riparian owners; that legislation alone, rather than judicial decisions, could effect such a transfer of state lands; and that the legislature, by repeated enactments, has expressly declared that the state is the beneficial owner thereof.

The state further asserts that its actions in authorizing the temporary drainage of Syracuse Lake and the removal of ore beneath it under the leases described, taken pursuant to statutory authority, did not constitute the parceling and sale or alienation of said lands in violation of its sovereign or governmental title; or in violation of the trust in which it held such lands for the people, since (a) such actions did not interfere with the public right of navigation, and (b) they were in conformity with the state's duty, as trustee, to put such lands to their greatest productive and beneficial use for the benefit of all the people.

As previously stated, the trial court's findings and conclusions upheld the position of the state as above set forth.

■ It is well settled that the test of navigability to fix ownership of lake beds must be determined as of the date of a state's admission to the Union and under the federal decisions with reference thereto. United States v. Utah, 283 U. S. 64, 75, 51 S. Ct. 438, 75 L. ed. 844; United States v. Appalachian Elec. Power Co. 311 U. S. 377, 408, 61

S. Ct. 291, 300, 85 L. ed. 243, 253; Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. R. 789; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465.

■ The federal test of navigability, as laid down by the United States Supreme Court, is stated in United States v. Holt State Bank, *supra,* as follows (270 U. S. 56, 46 S. Ct. 199, 70 L. ed. 469):

"The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

■ Thus, at various times the United States Supreme Court has stated (1) that the capability of use rather than the extent or manner thereof by the public for transportation and commerce affords the true criteria of navigability of waters, United States v. Holt State Bank, *supra;* (2) that a watercourse may be navigable notwithstanding serious obstructions occasioned by natural barriers such as rapids and sand bars, The Montello, 87 U. S. (Wall.) 430, 439, 22 L. ed. 391; (3) that the true test of navigability of waters does not depend upon the mode in which the commerce thereon is conducted or the difficulties attending it, United States v. Utah, 283 U. S. 64, 76, 51 S. Ct. 438, 75 L. ed. 844, *supra;* (4) that the uses and purposes to which waters may be put to meet the test of navigability vary from the carrying of ocean liners to the floating out of logs, United States v. Appalachian Elec. Power Co. 311 U. S. 405, 61 S. Ct. 298, 85 L. ed. 252, *supra;* (5) that the density of traffic on

waters may vary widely, but the tests must take these variations into account, United States v. Appalachian Elec. Power Co. 311 U. S. 405, 61 S. Ct. 298, 85 L. ed. 252, *supra;* (6) that a waterway otherwise suitable for navigation is not barred from that classification merely because artificial aids are required before commercial navigation may be undertaken, United States v. Appalachian Elec. Power Co. 311 U. S. 407, 61 S. Ct. 299, 85 L. ed. 252, *supra;* (7) that once a waterway is determined to be navigable it remains so, United States v. Appalachian Elec. Power Co. 311 U. S. 408, 61 S. Ct. 299, 85 L. ed. 253, *supra;* Economy Light & Power Co. v. United States, 256 U. S. 113, 123, 41 S. Ct. 409, 412, 65 L. ed. 847, 854; (8) that temporary abandonment or disuse of a waterway as a highway of commerce does not terminate its navigable status, since subsequent improvements may restore its usefulness, Economy Light & Power Co. v. United States, 256 U. S. 124, 41 S. Ct. 413, 65 L. ed. 855, *supra,* and (9) that artificial obstructions such as lumber and dams which may be abated by exercise of public authority do not prevent a stream from being navigable in law. Economy Light & Power Co. v. United States, *supra.*

The language of the Appalachian case appears particularly applicable here. Therein the court stated (311 U. S. 416, 61 S. Ct. 303, 85 L. ed. 257):

"Use of a stream long abandoned by water commerce is difficult to prove by abundant evidence. Fourteen authenticated instances of use in a century and a half by explorers and trappers, coupled with general historical references to the river as a water route for the early fur traders and their supplies in pirogues and Durham or flat-bottomed craft similar to the keelboats of the New, sufficed upon that phase in the case of the DesPlaines. Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation."

■ Under the foregoing tests and decisions, it cannot be seriously disputed that the evidence submitted at the trial herein is sufficient

to sustain the trial court's finding that Syracuse Lake at the time of Minnesota's admission to statehood was part of a navigable waterway.

Such evidence clearly established that Syracuse Lake and other connecting lakes were in reality widenings of the Embarrass River; that for many years prior to Minnesota's admission to statehood they were part of a route, used by Indian trappers and by individual fur traders, as well as agents of the Northwest Fur Company and later the American Fur Company, extending from the mouth of the St. Louis River at Lake Superior up said river to the Embarrass River; up the Embarrass River, Embarrass Lake, Syracuse Lake, Wine Lake, and Sabin Lake; thence via portage to Pike River; thence down Pike and Vermilion Rivers into Lake Vermilion; thence by other waters into Rainy Lake and Lake of the Woods. The trial court further found that prior to and since statehood such route was used by Indians for travel and for transportation of furs, fish, and supplies by canoe, and by timber and lumber interests for moving down forest products and floating down logs.

The evidence submitted to establish the foregoing included:

(1) Excerpts from House Executive Document No. 451 of the 25th Congress, Second Session, a message from President Van Buren, dated July 2, 1838, to the House of Representatives, transmitting to the latter a report of the secretary of state relative to the proceedings of the commissioners appointed by the United States and Great Britain under the seventh article of the Treaty of Ghent, to fix and determine the boundary between the United States and the possessions of Great Britain in North America, from the foot of Neebish Rapids to the northwesternmost point of Lake of the Woods; which excerpts included certain exhibits and statements presented to and considered by said commissioners in making their determination, as follows:

(a) A letter from one William McGillivray, described as "the best living authority on this subject" (the northwest trade routes), to John Hale, British agent to the commission, dated September 4,

1824, described the water route, including Syracuse Lake here under consideration, as follows:·

"* * * There is, however, another route of communication with the interior from Lake Superior, and the one which should have been fixed upon as the boundary line at the time of making the Treaty of Paris. Into the west bay of Lake Superior, known by the name of Fond du Lac, falls the river St. Louis, by far the largest stream which that lake receives into its bosom. By this river, and in its vicinity, there is a route to the interior country (to Lake La Pluie and the Lake of the Woods); it was practiced from the year 1796 by the Northwest Company, until that country was given up to the Americans, in consequence of the Treaty of Ghent, and has since that time been constantly used by the American Fur Company."

(b) An affidavit of one Samuel Thompson, an assistant surveyor to the commission, dated June 7, 1827, who surveyed the St. Louis River and who described the route by the St. Louis as having 21 carrying places;

(c) An affidavit of one David Thompson, described as "a partner of the Northwest Company" who "remained in * * * the Northwest for sixteen years, surveying, taking observations, and studying to acquire a perfect information of the country, between 1794 and 1812." Again, subsequent to 1816, he explored for several years those parts of the Northwest. In his affidavit, dated June 3, 1827, he described the route as follows:

"* * * along the whole circuit of Lake Superior, this river [the St. Louis] has no parallel, for being navigable * * *."

(d) Ancient maps, outlining the trade route via the St. Louis and Embarrass Rivers, which included Syracuse Lake although thereon it was shown as merely a widening of the river.

(2) Testimony of Dr. Grace Lee Nute, curator of Minnesota manuscripts of the Minnesota Historical Society, whose research embraced ancient documents, maps, and records relating to this part of Minnesota. Included therein were records of the Hudson Bay Company in London, the Northwest Company in London and Edin-

burgh, the old French fur traders in Paris and Montreal, and various records of the American Fur Company. Based upon such research, Dr. Nute testified that Syracuse Lake was part of a well-recognized route of the fur trade, extensively used for many years prior to Minnesota's admission to statehood.

(3) Testimony of Joe Boshey, an Indian 95 years of age, who testified, through an interpreter, as to his own recollections of the operations of the fur traders, from Lake Vermilion to the mouth of the St. Louis River, by canoe over the portages and through the bodies of water here involved. His recollections went back to construction of the Vermilion trail some time prior to 1864. He testified further that he was familiar with the hauling of furs down the route, and with return trips wherein the traders carried supplies over the same.

(4) Testimony of Harold Allan Lever and Oscar Irvin Buckmaster, chief engineer and district appraiser, respectively, for the division of lands and minerals of the Minnesota conservation department, who had recently examined this route and the portages in connection therewith and who testified that evidence of portages between the bodies of water described still existed, although now overgrown with weeds and foliage and almost obscured from sight.

(5) Ancient maps and surveys made prior to Minnesota's admission to statehood, clearly indicating the trade route here involved and establishing Syracuse Lake as a part thereof.

It is clear that the evidence outlined above was ample to sustain the trial court's finding that Syracuse Lake was part of a navigable waterway at the time of Minnesota's admission to statehood.

■ It is well settled that upon admission of a state to the Union title to the beds of all navigable waters therein remains in the state, the federal government taking no title or interest therein except under its power to regulate commerce between the states. Pollard v. Hagan, 44 U. S. (How.) 212, 11 L. ed. 565; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. ed. 331; Scott v. Lattig, 227 U. S. 229, 33 S. Ct. 242, 57 L. ed. 490, 44 L.R.A.(N.S.) 107.

■ It follows that the riparian owners here acquired no title to the bed of Syracuse Lake below low-water mark by virtue of the patents issued to them or their predecessors by the United States covering lands adjoining this navigable lake. Under the decisions of this court, it seems equally clear that they did not acquire any right or *beneficial* interest in and to the bed of this lake, other than (1) the ordinary riparian rights of navigation, dockage, wharfage, and similar privileges, or (2) those contingent rights or privileges resulting from the doctrine of *accretions and relictions.*

In Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 301, 17 N. W. 628, 47 Am. R. 789, *supra,* Mr. Justice Mitchell, speaking for this court, stated these governing principles as follows:

"In this state it is the settled doctrine that the riparian owner has the fee to low-water mark. * * * But while he only has the fee to low-water mark, he has certain riparian rights incident to the ownership of real estate bordering upon a navigable stream. Among these are the right to enjoy free communication between his abutting premises and the navigable channel of the river, to build and maintain suitable landings, piers, and wharves, on and in front of his land, and to extend the same therefrom into the river *to the point of navigability, even beyond low-water mark, and, to this extent, exclusively to occupy for such and like purposes the bed of the stream,* subordinate only to the paramount public right of navigation. * * * These riparian rights are property, and cannot be taken away without paying just compensation therefor." (Italics supplied.)

In Lamprey v. State, 52 Minn. 181, 198, 53 N. W. 1139, 1143, 18 L. R. A. 670, 38 A. S. R. 541, Mr. Justice Mitchell again stated:

"* * * where the lake is navigable in fact, its waters and bed belong to the state, in its sovereign capacity, and * * * *the riparian patentee takes the fee only to the water's edge,* but with all the rights incident to riparian ownership on navigable waters, including the right to accretions or relictions formed or produced in front of his land by the action or recession of the water. Of course, it is

a familiar principle that *these riparian rights rest upon title to the bank or shore, and not upon title to the soil under the water.*" (Italics supplied.)

In Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 112, 117, 42 N. W. 596, 44 N. W. 1144, 1145, 1147, 7 L. R. A. 722, the question involved was whether riparian rights might be alienated from the land and separately transferred. Therein the court summarized such rights as follows:

"* * * Subject only to the limitation that he shall not interfere with the public right of navigation, he has the unquestionable and *exclusive* right to construct and maintain suitable landings, piers, and wharves into the water, and *up to the point of navigability,* [italics supplied] for his own private use and benefit. * * * And it is obviously immaterial, if the public interests be not prejudiced, whether the submerged land be covered with wharves of timber or stone, or be reclaimed from the water by filling in with earth so that it becomes dry land. The land may be so reclaimed. * * *

"This private right of use and enjoyment is not, we think, limited to purposes connected with the actual use of the navigable water, but may extend to any purpose not inconsistent with the public right.

* * * * *

"* * * We do not wish to be understood as assenting to the proposition that the title of the state may be thus transferred by acts of the riparian proprietor which the state has no particular reason at the time for opposing. It may be doubtful whether the title does not remain unchanged, and whether if, in the future, it should become necessary for the state to broaden the navigable channel so as to embrace the reclaimed land, it would not have the right to do so."

In Petraborg v. Zontelli, 217 Minn. 536, 547, 15 N. W. (2d) 174, 180, we defined the rights of riparian owners as follows:

" "* * * The extent of the property right is well expressed in Warder v. Springfield [9 Ohio Dec. (Reprints) (855)], where it is

466

said that no riparian proprietor owns an integral part of, or has absolute property in, the waters of a stream, but each has only the use of their flow past his lands for ordinary domestic, manufacturing, and other lawful purposes. * * * *The property, therefore, consists, not in the water itself, but in the added value which the stream gives to the land through which it flows.'* * * * True, the riparian owner takes only to the water line, but he may deny access to and from the water at his particular property; he may build piers and wharves from his land out to navigable waters; he has an exclusive right of access to the lake * * *; and he may claim accretions and relictions caused by changes in the current or flow of the water."

Finally, in State v. Korrer, 127 Minn. 60, 72, 148 N. W. 617, 622, 1095, L. R. A. 1916C, 139, *supra,* wherein the court specifically denied the right of riparian owners to mine ore beneath the bed of a navigable lake, it stated:

"* * * While the Minnesota cases recognize the right to use the bed of the stream or lake for purposes not connected with the actual use of the water, we know of no case in Minnesota or elsewhere where the right of the riparian proprietor has been recognized as possessing the right of utilizing the bed of a public body of water below low-water mark for purely private purposes disconnected with the use of the water, to the extent of destroying its existence, and against the protest of the state.

"It may be noted that no decided case has ever sustained the title of the riparian owner to the minerals under public waters or the right to remove them under any circumstances. * * * Under the law of this state the state owns the soil under public waters in a sovereign not a proprietary capacity, *but still the state owns it and the shore owner does not.*" (Italics supplied.)

Under the foregoing Minnesota decisions, it is clear that the riparian owners here can claim no title whatsoever to the bed under Syracuse Lake unless the state by legislative grant has relinquished its title to the riparian owners or unless they have gained a portion

thereof as the result of accretions or relictions. (There is no contention here by the riparian owners that the state either by legislative grant or by act of grace has ever relinquished to them its title to the bed of Syracuse Lake.)

■ Under the doctrine of accretions and relictions, where applicable, it is universally held that riparian owners gain a vested right in property added to their riparian lands as a result of deposits from the waters or because of their recession. Here, there is no claim that land has been added as a result of accretions. As to relictions, the evidence is undisputed that until the time of its drainage by the state Syracuse Lake maintained a fairly constant level. Accordingly, the only possible claim based upon reliction must rest upon the theory that temporary drainage of the lake pursuant to statutory power constituted a reliction, vesting the riparian owners with full title to the lands in question.

The drainage of the lake here was sudden and artificial, accomplished through the agency and authority of the state. It is of a temporary nature, and the evidence discloses that as soon as the drainage pumps cease the lake will again fill up. Under the lease, the lessee, defendant Lake Mining Company, if required by the state, is obliged to return the water to the lake and reconnect and restore the prior channel as soon as the temporary purposes authorized by the lease have been completed. Under such circumstances, the doctrine of relictions would appear to have no application.

1 Cooley's Blackstone (3 ed.) Book II, p. 260, states the doctrine of relictions as follows:

"And as to lands gained from the sea, either by *alluvion,* by the washing up of sand and earth, so as in time to make *terra firma;* or by *dereliction,* as when the sea shrinks back below the usual watermark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. * * * But if the alluvion or dereliction be sudden and considerable, in this case it belongs to the king; for, as the king is lord of the sea, and so owner of the soil

while it is covered with water, it is but reasonable he should have the soil when the water has left it dry."

The courts of many states have upheld the principles thus enunciated. See, Noyes v. Collins, 92 Iowa 566, 61 N. W. 250, 26 L. R. A. 609, 54 A. S. R. 571; Gill v. Lydick, 40 Neb. 508, 59 N. W. 104; Luscher v. Reynolds, 153 Or. 625, 56 P. (2d) 1158; Martin v. Busch, 93 Fla. 535, 112 So. 274. Minnesota has not had occasion to pass upon this issue, but has recognized the principle expressed in 1 Cooley's Blackstone, *supra,* in Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 A. S. R. 541, *supra;* and in Hanson v. Rice, 88 Minn. 273, 92 N. W. 982.

■ It is also clear that before a riparian owner can claim title to lands as a result of relictions, *such reliction must be of a permanent nature,* without the possibility of the water again filling in or covering the relicted area. As stated in Troska v. Brecht, 140 Minn. 233, 167 N. W. 1042, involving a lake which had dried up temporarily but had subsequently again filled in (140 Minn. 239, 167 N. W. 1044):

"'* * * But the lake again filled up from natural causes in 1902, and has remained substantially in its original condition ever since. The lake did not lose its character as a meandered lake by a mere temporary recession of its waters; to have that effect the recession must be permanent."

See, also, State v. Thompson, 134 Iowa 25, 111 N. W. 328; Anderson v. Ray, 37 S. D. 17, 156 N. W. 591; Flisrand v. Madson, 35 S. D. 457, 152 N. W. 796; Sapp v. Frazier, 51 La. Ann. 1718, 26 So. 378, 72 A. S. R. 493.

Based upon the foregoing authorities, it follows that in the instant case the riparian owners cannot rest their claims on the doctrine of accretions and relictions.

■ It is equally clear that there has been no legislative enactment or grant vesting these shore owners with any interest in the portion of the lake bed involved. On the contrary, the acts of the legislature with reference thereto have been exactly to the opposite

effect. It has consistently and constantly affirmed the right of the state to ore lands under the beds of navigable lakes and streams. Thus, L. 1889, c. 22, authorized the commissioner of the land office to execute leases and contracts for the mining and shipping of ore from any lands belonging to the state; L. 1901, c. 104, provided that the state reserve for its own use all the iron and other valuable minerals, and that the title thereto shall not be affected by the of any act of congress; L. 1909, c. 49, declared that all iron ores and other minerals on, in, or under the lands within the state which lie beneath the waters of meandered lakes and rivers belong to the state, together with the right to remove such iron ore and other minerals, and that the title thereto shall not be affected by the subsequent drying up of such lakes and rivers; L. 1911, c. 291, § 1, declared that the ownership of the beds and lands under the waters of all rivers in this state which are navigable for commercial purposes shall be in the state in fee simple, subject to the regulations made by congress; L. 1917, c. 110, passed subsequent to State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139, *supra,* authorized the execution of leases such as the one attached to the complaint here, providing for the drainage of lakes and rivers, or the diversion of waters, to permit the removal of ore; L. 1931, c. 286, gave the executive council authority to extend contracts under the above and authorized the granting of licenses to drain public lakes; and L. 1943, c. 208, recognized and protected existing leases.

The foregoing enactments, which comprise all the laws on this subject enacted by our legislature since statehood (except L. 1897, c. 257, declared unconstitutional in Shell v. Matteson, 81 Minn. 38, 83 N. W. 491), establish clearly the state's intention of reserving the title and beneficial ownership of such lake beds in itself. Certainly nothing therein can be construed as a legislative grant thereof to the riparian owners. Likewise, since the rights of these riparian owners to future accretions and relictions are contingent only, it is apparent that they have been cut off before their consummation by the foregoing legislative enactments. See, Webber v. Axtell, 94 Minn. 375, 102 N. W. 915, 6 L.R.A.(N.S) 194; Griswold v. McGee, 102

Minn. 114, 112 N. W. 1020, 113 N. W. 382, 12 Ann. Cas. 186; Western Pacific Ry. Co. v. Southern Pacific Ry. Co. (9 Cir.) 151 F. 376; Taylor v. Underhill, 40 Cal. 471; Eisenbach v. Hatfield, 2 Wash. 236, 26 P. 539, 12 L. R. A. 632.

The foregoing decisions, statutes, and authorities make it clear beyond doubt that the riparian owners here can assert no right, title, or interest in and to the ore under the bed of Syracuse Lake below the low-water mark by virtue of (a) patents issued by the United States to the adjoining lands; (b) any decision of the courts of this state; (c) any legislative enactment or grant; or (d) the doctrine of accretions and relictions.

██ This is an action brought by the state to determine its right of ownership to the ore below low-water mark of the bed of Syracuse Lake and at the same time to establish that the riparian owners have no interest therein. The opinion up to this point definitely establishes that the riparian owners have no interest therein. There remains, then, for consideration only the nature of the state's title to such lake bed and the question whether thereunder it has the right to remove and dispose of the ore under such bed.

It is well settled that at the time of its admission to statehood Minnesota retained and reserved unto itself the same rights and privileges which were reserved and retained by the original Thirteen Colonies at the time the federal government was established. Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. ed. 331, *supra*. Such rights and privileges reserved included the right and title to all navigable waters and the soil under them for the common use, subject only to the rights surrendered to the general government. This principle is stated in Martin v. Waddell, 41 U. S. (Pet.) 367, 410, 10 L. ed. 997, 1013, as follows:

"* * * when the Revolution took place, the people of each state became themselves sovereign; *and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since sur-*

rendered by the Constitution to the general government." (Italics supplied.)

The ownership thus reserved to the states was defined in Mumford v. Wardwell, 73 U. S. (Wall.) 423, 436, 18 L. ed. 756, 761, as follows:

"[The] Necessary conclusion is, that the ownership of the lot in question, when the State was admitted into the Union, became *vested in the State as the absolute owner,* subject only to the paramount right of navigation."

To the same effect, see, Illinois Central R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. ed. 1018; Massachusetts v. New York, 271 U. S. 65, 46 S. Ct. 357, 70 L. ed. 838; Appleby v. City of New York, 271 U. S. 364, 46 S. Ct. 569, 70 L. ed. 992; and New Jersey v. Delaware, 291 U. S. 361, 54 S. Ct. 407, 78 L. ed. 847.

The nature of the title reserved to the states in such navigable water beds was defined in Illinois Central R. Co. v. Illinois, *supra,* where the court stated (146 U. S. 452, 13 S. Ct. 118, 36 L. ed. 1042):

"That the State holds the title to the lands under the navigable waters of Lake Michigan within its limits, * * *. But it is a title different in character from that which the State holds in lands intended for sale. * * * *It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.* * * * The trust devolving upon the State for the public * * * cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. *It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that*

*the language of the adjudged cases can be reconciled."* (Italics supplied.)

The foregoing decisions clearly establish that under the common law applicable at the time Minnesota was admitted to statehood it held absolute title, both sovereign and proprietary, to all the beds of navigable waters within its boundaries, in trust for the people of the state, primarily that they might enjoy navigation of the waters, carry on commerce on them, and have the liberty of fishing in them free from the interference of private parties. It is made clear by the decisions of the United States Supreme Court subsequent to statehood, particularly in the case of Illinois Central R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. ed. 1018, *supra,* that in the exercise of such trust the state may dispose of partial interests in such lands, in the interest of all the people of the state, provided the primary purposes of the trust are not unduly abridged or burdened thereby.

Minnesota decisions in general have been in accord with the principles thus stated. Therein, the character of the state's title in such lands is frequently defined as sovereign rather than proprietary. Examination of such decisions makes it clear that the use of the word "sovereign" was intended merely to indicate that the state held such title in trust for the people, for the purposes of public navigation, commerce, and fishing, and hence that it could not divide or parcel the same for sale as it might other lands. In Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 300, 17 N. W. 626, 628, 47 Am. R. 789, this principle was stated thus:

"* * * At common law, the king, as representative of the nation, held in trust for them all navigable waters, and the title to the soil under them. This was a sovereign or prerogative, and not a proprietary right. At the revolution the people of each state became sovereign, and in that capacity held all these navigable waters and the soil under them for their common use, * * *."

In Lamprey v. State, 52 Minn. 181, 198, 53 N. W. 1139, 1143, 18 L. R. A. 670, 38 A. S. R. 541, this doctrine was expressed as follows:

"In this state, we have adopted the common law on the subject of waters, with certain modifications, suited to the difference in conditions between this country and England, * * * and * * * we have repudiated the doctrine that the state has any private or proprietary right (as had the king) in navigable waters, but that it holds them in its sovereign capacity, as trustee for the people, for public use."

In the language quoted, the state's ownership was thus distinguished from the ownership of the king under the ancient English doctrine that the latter was in the nature of a private estate in the beds of navigable waters which might be conveyed to any subject. The repudiation of this doctrine did not of necessity negative the absolute title of the state, subject only to its public trust, nor in any manner constitute a restriction on the state's right as trustee to dispose of beneficial interests in such lands, provided that in so doing it (a) acted for the benefit of all the citizens, and (b) did not violate the primary purposes of its trust, namely, to maintain such waters for navigation and other public uses.

In the exercise of its trust, it cannot be seriously doubted that the state has the power, and, in fact, the duty rests upon it, to use such lands for the greatest public good, and, where they can be put to productive use, not to permit them to lie waste and unproductive. In so doing, of course, it cannot parcel or alienate them or otherwise interfere with the public purposes of the trust in which they are held. It is clear in the instant case that the state has acted pursuant to statutory authority; that it has not parceled or alienated the lands in question, deprived the public of its rights to navigation or other public uses therein, or otherwise acted in violation of its trust. We have held in a number of decisions that the disposal of iron ore in state lands pursuant to an ordinary mining lease such as is here involved does not constitute a sale or alienation of such state lands. Thus, in State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, it was held that R. L. 1905, §§ 2483-2495, whereunder the state reserved for its own use all iron and other minerals in lands owned by it and authorized its land commissioner to issue

on its behalf mining leases providing for payment to the state of specified royalties on the ore removed, did not provide for or constitute a sale of such lands in violation of constitutional provisions. Therein we stated (99 Minn. 225, 227, 108 N. W. 960):

"* * * The term, *no portion of the lands,* as used in the constitution, does not refer to the *separate substance or product of a particular tract of land.* * * *

* * * * *

"The term sale, as ordinarily used, * * * means the transfer of the absolute or general property in the thing sold. In determining whether a mineral lease of the kind here in question is a sale, neither the name nor form given to it by the statute is controlling. The legal effect of the transaction determines its classification, not its form. * * *

* * * * *

"* * * the rule established by the great weight of authority [is] that *such leases do not constitute a sale of any part of the land,* and, further, that iron or other materials derived from the usual operation of open mines or quarries, constitute the rents and profits of the land, * * *." (Italics supplied.)

See, also, State v. Cavour Min. Co. 143 Minn. 271, 173 N. W. 415; Boeing v. Owsley, 122 Minn. 190, 142 N. W. 129; and State v. Royal Mineral Assn. 132 Minn. 232, 156 N. W. 128, Ann. Cas. 1918A, 145.

In many states which, like Minnesota, apply the trust doctrine to state ownership of lands under navigable waters, it has been recognized that under such trusts the state has the right to remove from such lands minerals, oil, and other like products. In Wisconsin, where the trust doctrine prevails and where the courts have specifically held that the state has no proprietary interest in the lands under navigable waters, the supreme court, in Angelo v. Railroad Comm. 194 Wis. 543, 217 N. W. 570, held that, while the state could not transfer its title, nevertheless, under proper statutory authority, it could by lease confer upon private individuals authority to remove marl deposits from the lands under such waters. Numerous other states have held that the removal of minerals and

like deposits from lands under navigable waters does not constitute a violation of the state's trust or of the rights of riparian owners. See, Taylor v. Commonwealth, 102 Va. 759, 47 S. E. 875, 102 A. S. R. 865; Coosaw Min. Co. v. South Carolina, 144 U. S. 550, 12 S. Ct. 689, 36 L. ed. 537; State ex rel. Moose v. Southern S. & M. Co. 113 Ark. 149, 167 S. W. 854; Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. ed. 214; and Watson v. Holland, 155 Fla. 342, 20 So. (2d) 388; 1 Farnham, Waters and Water Rights, p. 396.

■ As stated earlier, the principal cases relied upon by the riparian owners are Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. R. 789; Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722; Shell v. Matteson, 81 Minn. 38, 83 N. W. 491; and the opinion on petition for rehearing in State v. Korrer, 127 Minn. 60, 77, 148 N. W. 617, 1095, L. R. A. 1916C, 139. We find nothing in these cases in conflict with the views here expressed.

In the Union Depot case, we held that an act of the legislature authorizing appellant there to use and occupy with its structures that part of Lake St. Croix in front of Stillwater between low-water mark and the center of the lake did not affect the rights of the riparian owners involved. This decision did not enlarge the ordinary rights of riparian owners, but reiterated our prior ruling that such an owner has the fee only to the low-water mark, and that, while a riparian owner holds exclusive rights of possession and beneficial interest in "made land" to the point of navigation, beyond that point such owner has no right to intrude.

In the Hanford case, there were involved only the rights of a riparian owner to submerged land between his outer boundary and the point of navigation. There, this court upheld the state's title to lands improved and reclaimed from the water up to the point of navigation when it said (43 Minn. 117, 44 N. W. 1147):

"* * * We do not wish to be understood as assenting to the proposition that the title of the state may be thus transferred by acts of the riparian proprietor which the state has no particular reason at the time for opposing."

In the Shell case, there was involved the constitutionality of L. 1897, c. 257, which provided for the settlement of disputes between riparian owners of beds of dried-up lakes on the basis of joint ownership thereof. Such a division, it was held, was *at variance with legal and vested rights of the parties,* and the act accordingly was held unconstitutional. It concerned only lakes which had gradually dried up. It could have no application to a situation such as here involved.

In the Korrer case, on petition for reargument, it appeared (127 Minn. 77, 148 N. W. 1095) that before trial a stipulation had been made between the state and the defendant mining company which recited that the mining company might remove ore already stripped from a certain area below the lake bed involved, but that it should pay the state therefor if the court determined that the state owned such ore in a proprietary capacity. The majority of the court construed this stipulation as giving the state the right to recover this sum only in the event that the prior opinion had thus determined the state's ownership; and that, since such prior opinion merely held that the state owned the bed of the lake below low-water mark in its sovereign capacity in trust for the people, it necessarily followed that under the stipulation the state had no right to recover for the ore involved. In its memorandums, with reference to the Korrer case, the trial court in the instant case stated:

"Certainly this final disposition of the Korrer case, resting as it does upon a disputed interpretation of the stipulation in question, does not leave the law in that state of clarity that might be desired. It is argued with much force that if the State does not own the ore in a proprietary capacity and the value of it was awarded to the riparian owner, it must have been intended to imply that the riparian owner owns the ore under the lake. However, I do not agree with that contention. Such construction of the per curiam opinion would run counter to much that was stated to be the law in the first opinion.

\* \* \* \* \*

"It does not seem to me that anything is to be gained by further analysis or discussion of the Korrer case. I do think that the court's opinion is not satisfactory and does not leave clear what the ultimate holding of the Supreme Court will be."

With these statements we agree. If the opinion upon petition for rehearing there had not been limited to the situation then involved, we should be left in the position of holding that no one owns the bed of a navigable lake in such a character that the valuable minerals under it could ever be mined.

■ Appellants rely on United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465, as holding that under the Minnesota decisions the bed of a navigable lake belongs to the shore owners. In that case, the action was between the United States and riparian owners, and the state was not represented. While the decision of the Supreme Court throws little light on the reasons which compelled the conclusion there arrived at, it is clear from the circuit court's decision therein that the latter court regarded the case as governed by the doctrine of accretions and relictions, not here involved. Any statutory justification for a transfer of title to the riparian owners in that case must be found in L. 1905, c. 230, under which the lake there was drained. While there is no direct statement in such statute to this effect, it may be inferentially drawn from the statement therein (§ 6) that the viewers were required to show, among other things, "the number of acres added to any tract by the total or partial drainage of any meandered lake, or by the change of any water course, and the location and value of such added land; * * *." The decision in the Holt case does not appear to be in point here, and is, of course, not binding on this court.

■ The United States Supreme Court, in the case of United States v. California, 332 U. S. 19, 67 S. Ct. 1658, held that the United States is entitled to the resources of the soil under the ocean within the three-mile marginal belt. In that case, however, the court did not overrule its previous holdings in Pollard, Lessee, v. Hagan, 44 U. S. (How.) 212, 11 L. ed. 565; Martin v. Waddell, 41 U. S. (Pet.)

367, 10 L. ed. 997, *supra,* and other cases, but recognized the holdings therein as still applicable to *inland* navigable waters. There the court said (332 U. S. 36, 67 S. Ct. 1667):

"As previously stated, this Court has followed and reasserted the basic doctrine of the Pollard case many times."

■ The foregoing authorities indicate that the state, under proper statutory authority, may provide for the removal of ore beneath the beds of its navigable waters. The statutory authority in the instant case is conferred by L. 1917, c. 110, and subsequent statutes cited *supra,* under which these operations have taken place. Here, there is no attempt to deprive riparian owners or the public of their rights to navigation or other public uses in the waters involved or to take from such shore owners their property without due process of law. We have consistently held that the latter have no property beyond the low-water mark other than their rights incidental to navigation, wharfage, and other like uses. There has been no grant from the legislature conferring upon them any rights in this lake bed. The legislature has repeatedly declared title to such lands to be in the state, with the right in the latter to remove ore therefrom. Such removal is consistent with the state's sovereign title, as defined by the common law in existence at the time Minnesota was admitted to statehood, and in subsequent interpretations thereof both by the United States Supreme Court and by this court. It is not in conflict with the trust theory under which it holds title to such lands, nor its duty as trustee to exercise such trust for the greatest good of all the people.

Affirmed.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.