# IN RE APPLICATION OF GENEVRA BINGENHEIMER AND OTHERS TO REGISTER TITLE TO CERTAIN LANDS IN ITASCA COUNTY v. DIAMOND IRON MINING COMPANY AND OTHERS.
## STATE OF MINNESOTA, OBJECTOR.[1]

July 25, 1952.

No. 35,767.

[1]Reported in 54 N. W. (2d) 912.

*H. P. Clarke, W. H. Crago, Donald D. Harries,* and *James F. Murphy,* for appellants.

*J. A. A. Burnquist,* Attorney General, and *Victor J. Michaelson* and *G. L. Ware,* Special Assistant Attorneys General, for the State of Minnesota.

*W. K. Montague* and *Nye, Montague, Sullivan, Atmore & McMillan* filed a brief as *amici curiae* in support of the contention of appellants.

MAGNEY, JUSTICE.

The applicants[2] in this proceeding to register title[3] to the SE ¼ of NE ¼ of section two, township 55 north, range 25 west of the fourth principal meridian, in Itasca county, Minnesota, appeal from the decree of registration adjudging that they are owners in fee simple of the tract described, excepting the land underlying a body of water located on the tract and known as Pond A, lying and being below the ordinary low-water mark of the pond on May 11, 1858 (elevation 1310.5, sea-level datum).

In the registration proceeding the state was made a party defendant. It filed an answer (all other defendants being in default) claiming an interest in two parcels, described by metes and bounds, as parts of the bed of certain claimed navigable public lakes known as Chain Lakes; hence, that said parcels are owned by the state in its sovereign capacity for the benefit of the public.

The district court on August 24, 1950, held that the bodies of water located on the land (identified in these proceedings as Ponds A, B, and C) were not navigable at the date of admission of the state of Minnesota to the Union, and that title to the entire 40-acre tract was conveyed by the state to the Taylor's Falls & Lake Superior Railroad Company, and by subsequent conveyances to the applicants. Motions for amended findings and conclusions or a new trial were made both by the state and by applicants, and on December 3, 1951, the district court filed amended findings and

---

[2]Genevra Bingenheimer and Emma M. Wilkinson each claims an undivided one-quarter interest in the entire 40-acre tract, and Oliver Iron Mining Company claims an undivided one-half interest.

[3]Under the Torrens Act, M. S. A. 508.01, *et seq.*

conclusions. In these amended findings, the district court held that one of the ponds, identified as Pond A, was navigable at the time of admission of the state to the Union, that the title acquired by virtue of the navigability of the pond has not been conveyed by the state, and that the state is not barred by the doctrine of estoppel or the statute of limitations from asserting its title.

A decree pursuant to the terms of the amended findings, registering title to the tract in question, but excepting from the registration the lands underlying Pond A, was entered December 17, 1951. An amended decree was entered January 14, 1952. The applicants seek reversal of the decree insofar as it limits registration of title in them to less than a full 40 acres, and they seek modification of the decree by removal of the exception. The sufficiency of the evidence to support the findings of fact is not challenged.

The applicants make four principal assertions which, if sustained on this review, would require a modification of the decree:

(1) Pond A was not navigable at the time of the admission of the state of Minnesota to the Union on May 11, 1858.

(2) Even if Pond A was navigable at that time, title to the entire 40-acre tract was conveyed by the state to the Taylor's Falls & Lake Superior Railroad Company pursuant to Sp. L. 1875, c. 51, and by mesne conveyances to the applicants.

(3) In any case, the state is estopped to deny that title to the bed of Pond A was conveyed by the state to the remote grantors of the applicants.

(4) The state is barred from asserting a claim to the land underlying Pond A by the statute of limitations.[4]

Three bodies of water, sometimes called Chain Lakes but in these proceedings called Ponds A, B, and C, are located in part on the subdivision of land sought to be registered. Ponds B and C lie to the south of Pond A. The ponds are located in a horseshoe-shaped catchment basin of 1.15 square miles. A high ridge extends along the north, east, and south sides of the ponds, reaching a crest about

[4]L. 1943, c. 529, as amended, L. 1945, c. 124 (M. S. A. 541.023).

a mile distant from the ponds. To the west, a swampy and marshy area extends for some distance in a northwesterly direction. The level of the outflow or control point or natural outlet of Ponds B and C at the time of admission of the state to the Union was in the southwest corner of Pond C, where it drains in the direction of Prairie River, a navigable tributary of the Mississippi River; in a state of nature at that time, a channel extended from said control point in the direction of Prairie River, less than a mile away, and certain portions thereof were well defined. Such control point in 1858 was at 1311.8, sea-level datum. The mouth of the run-out in the state of nature was 20 feet wide.

For a better understanding of the features of the area in question as they exist today, exhibit AAA, a sketch thereof, is shown herewith.

The district court found that on May 11, 1948, the water level of Pond A was 1305, sea-level datum. Pond A has a present area of approximately 25 acres, with a maximum depth of 20.5 feet. Ponds B and C are located in a marshy area with slightly sloping ground, so that the area of Ponds B and C varies greatly with changes in the water level, but they are shallow at all probable levels of water. In times of high water, Ponds B and C would be joined as one body of water.

The trial court found, and the evidence amply supports the finding, that Pond A was of sufficient area and depth in 1858 to float logs. But it does not necessarily follow that the pond was navigable from the fact that it would float logs. Navigable waters are waters which are used or usable as highways of commerce. It is quite apparent that no practical commercial purpose would have been or would be served by rafting or driving logs from one shore to the other in this small pond or lake.

Evidence was introduced to show that large pine trees, more than 100 years old, stand around Pond A above an elevation of 1313, but that no large trees stand below that elevation, nor are there stumps of large trees. There are at present birch trees of a maximum age of 40 years growing below elevation 1313. Upon the

basis of this and other evidence, particularly the various surveys made of the area in early years, the trial court found, and the finding is not attacked by the applicants, that on May 11, 1858, when Minnesota became a state, the water level of Pond A was elevation 1313. It was also found that the water remained at that level for a sufficient time to prevent growth of trees until about 40 years ago, when, by reason of removal of timber from the area, the construction of a railroad along the west side of the lakes and of an off-take ditch from the outlet of Pond C, the water level of the ponds was lowered substantially. The off-take ditch constructed by the railway company had a cut 7.5 feet in the first 100 feet southwest of Pond C. It had its point of beginning within the bed of Pond C. The ditch tapered in depth to a point where the grade of the bottom of the ditch coincided with the natural ground. It would seem that this ditch lowered the point of outflow 7½ feet. The lower level has been maintained since that time.

The trial court also found that the water remained at elevation 1313 during the spring runoff and during times of unusually heavy precipitation. Ordinary low-water mark was at elevation 1310.5. At elevation 1313, approximately 155 acres were submerged by the increased size of Ponds B and C; Ponds B and C at that elevation were one body of water, with a channel connecting them to Pond A, which at this water level covered between 35 and 40 acres. Water at that control point to the channel leading to the Prairie River was 1.2 feet deep.

Evidence still exists of old logging roads extending from the ridges and hills to the east, west, and south of the ponds toward Pond A and terminating at the pond, but there is no evidence of any logging roads leading from the ponds toward the Prairie River. The evidence also shows that the property had been drilled and that roads would be used for carrying drills, equipment, and ore and possibly for the construction and maintenance of camps. Before the area was logged, there were approximately 10,000,000 feet of Norway and white pine timber on the slopes and ridges adjacent to the ponds. There is no evidence that the ponds had

ever been used for water travel or transportation prior to the admission of the state to the Union; and, except for the purpose of floating logs, the ponds were not suitable for commerce. Aside from the existence of old logging roads, there was no evidence that the ponds had ever in fact been used for floating logs, and the court made no finding that they were so used. However, it was found that Pond A was of sufficient size and depth to float logs. The following facts, very important in the determination of the issue in this case, are best stated in the language of the court:

"* * * that during the spring run-off in years of normal precipitation and during times of unusually heavy precipitation, it was feasible to float logs from Pond A and through the channel connecting the same with Pond C, and thence down through the outlet channel to Prairie River, but only with the use of such artificial improvements as dams and sluiceways; that the length of time that such operations in floating logs down to Prairie River with such artificial aids could be conducted each year depended upon the amount of water available and the rapidity with which such operations of floating logs was carried on; that in such operations water could be discharged at the rate of 100 second feet, and that at such rate the said operations could be carried on for a period of three days during ordinary spring run-offs; that at such rate more than one million feet of logs could be floated down to Prairie River in one day, but that such period of operations could be considerably lengthened by reducing the rapidity of the operations, both as to the amount of water discharged and the number of logs floated down to Prairie River; that considerable difficulty would accompany such operations; that except for the purpose of floating logs as herein found, the said lakes had no suitability for commerce; that there is no evidence that, prior to the admission of the State of Minnesota into the Union, the said lakes had ever been used for water travel or transportation; that because of such feasibility of Pond A for the floating of logs as herein found, said Pond A, at the time of Minnesota's admission to the Union, was a navigable and public body of water."

The proposed "artificial aids" "as dams and sluiceways," as referred to by the court, were described by S. A. Frellsen, a hydrological engineer, a witness for the state. He testified:

"Why, what I had in mind was the deepening of the channel across the bar between the lakes, what we call 3 [Pond A] and 1 [Pond C], in that area, so that saw logs could be either pushed through or driven through, or by an additional head of water impounded in that part of the lake, could be sluiced through into Lake 1 [Pond C].

"Q. To what extent would you consider deepening, widening that channel?

"A. Oh, a couple of feet, and maybe only six feet wide.

"Q. For what distance?

"A. Oh, less than 100 feet.

\* \* \* \* \*

"Q. The deepening of two feet and widening of six feet would be in this narrow neck between what has been referred to as Lake 3 [Pond A] and Lake 1 [Pond C]?

"A. Yes. You see the channel at present is a 'V' shaped channel. What I had in mind was to widen out the bottom and deepen it so as to get water from Lake 3 [Pond A] to Lake 1 [Pond C] more readily than would flow there, starting at 1313 it would be a foot and two inches deep over the bar and at the outlet. Likewise by deepening the channel the water in the upper storage—stored in the upper lake, the upper parts of it, could be conserved for more beneficial use in sluicing the logs down the outlet and the creek."

As to the deepening and widening of the channel at the so-called control point at the outlet, Mr. Frellsen testified:

"Well, I had in mind the construction of a sluice way, just a narrow—six-foot wide or so, about two—between two feet lower than the natural outlet, and controlled by a gate and a little short dyke on either side so as to control the outflow from the lake into the creek. I believe in that way it would be practical to sluice the logs down to the creek.

"Q.  That is it would be of some aid to accelerate the sluicing of logs down to the Prairie River?

"A.  Yes, and it would prevent the waste of water, if that was important.

\* \* \* \* \*

"Q.  Now, Mr. Frellsen, by the improvement of the channel such as you have now described, to what extent would that increase the outflow from the lake over what the outflow would be in a state of nature at the same water elevation, 1313?

"A.  That would make it possible to get sufficient volume of water at the lower stages to float, I believe, at least a three- to four-foot saw-log.

\* \* \* \* \*

"I think by adapting the sluice way and deepening an[d] improving the channel down stream from the sluice way structure itself, the water regulating structure, and improving of that channel by digging it out a little bit, would be a simple matter and assist in getting the timber down."

The outflow would cease from artificial construction at 1311.8. He was asked:

"Q.  Then in three days what would be the situation at that rate of flow [100 cubic feet per second]?

"A.  In three days that would mean the lake would be three feet lower.

"Q.  Well, then you wouldn't have any outflow then?

"A.  Not after three days, if there were no inflow."

Adolph Meyer, another hydrologist called by the state, testified:

"The lake could be used for moving the logs and sluicing them down to the Prairie River, using the large arm to the west mainly as a body for storing the water and using the Lake 3 [Pond A], and 2 and 1 [Ponds B and C] for moving the logs bodily on the lakes, with a control at the outlet.

"Q.  That is, by placing a control at the outlet of the lake 3 [Pond A]?

"A. Both at the outlet of Lake 3 [Pond A], and at the outlet of the Chain of lakes.

\* \* \* \* \*

"Q. What type of improvements did you have in mind that would improve the usefulness of the lake for the purpose of floating logs?

"A. Mainly the control of the outflow with a very small log dam and log sluice at the outlet."

He doubted whether it would be necessary to have any control between Pond A and Pond C.

By the use of appropriate hand-operated devices for removing and installing stop logs in the control structure, if the water at the outlet were raised to 1313, sea-level datum, an area of 155 acres, including Ponds B and C, would be submerged.

In all transactions concerning the subdivision in question, it has been treated as a full 40-acre tract. Since the land was first placed upon the tax rolls in 1892, it has been taxed as 40 acres.

■ Whether a body of water is navigable for the purpose of determining title is a federal question, and the federal, not the state, tests of navigability must be applied. United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465; State v. Longyear Holding Co. 224 Minn. 451, 29 N. W. (2d) 657.

■ States organized in the public domain, as was Minnesota, became vested upon admission to the Union with title to the beds of all waters then navigable and not previously granted by the United States, subject, of course, to the paramount power of the United States over such waters by virtue of its power to regulate commerce. Pollard's Lessee v. Hagan, 3 How. (U. S.) 212, 11 L. ed. 565; Barney v. Keokuk, 94 U. S. 324, 24 L. ed. 224; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. ed. 331; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465; Economy Light & Power Co. v. United States, 256 U. S. 113, 41 S. Ct. 409, 65 L. ed. 847.

■ The fact that the ponds were not meandered by the United States survey does not establish that the waterway was not in fact

navigable at the time of the survey, since surveying officers have no power to settle questions of navigability. Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. ed. 771; Harrison v. Fite (8 Cir.) 148 F. 781, 784, where the court said:

"The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water."

■ Applicants contend that the finding that it was feasible during the spring runoff and at times of unusually heavy precipitation to float logs from Pond A to Prairie River, but only with the use of such artificial improvements as dams and sluiceways, and that because of such feasibility Pond A was navigable, presents for decision the question whether the findings support a judgment that Pond A, at the time of admission of Minnesota to statehood, was navigable under the federal rule governing title to land under water. For the purposes of this appeal, applicants are not questioning the findings of fact, but do contend that the findings of fact do not support the conclusions of law. As they put it: "The basic question presented is: 'Do the findings sustain the judgment?'" Nor do they quarrel with the proposition that if a waterway is feasible for the floating of logs in commerce it is navigable and that the lake bed below the low-water mark belongs to the state.

We must therefore first consider whether the findings of the trial court support the conclusion that the waters of Pond A were navigable on May 11, 1858, under the federal criteria of navigability.

Before considering the case of United States v. Appalachian Elec. Power Co. 311 U. S. 377, 61 S. Ct. 291, 85 L. ed. 243, upon which the trial court placed its reliance when it changed its mind as to the navigability of the waters here involved, it seems desirable and necessary to make an examination of most of the prior decisions of the United States Supreme Court in which the question of navigability was involved. In the order of their decision they are: United

States v. Rio Grande D. & I. Co. 174 U. S. 690, 19 S. Ct. 770, 43 L. ed. 1136; Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. ed. 771; Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 67 L. ed. 140; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844; United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267. In United States v. Rio Grande D. & I. Co. *supra,* the court said (174 U. S. 698, 19 S. Ct. 773, 43 L. ed. 1140):

"* * * Examining the affidavits and other evidence introduced in this case, it is clear to us that the Rio Grande is not navigable within the limits of the Territory of New Mexico. *The mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river.* * * *

"* * * *Its use for any purposes of transportation has been and is exceptional, and only in times of temporary high water. The ordinary flow of water is insufficient.* It is not like the Fox River, which was considered in *The Montello,* in which was an abundant flow of water and a general capacity for navigation along its entire length, and although it was obstructed at certain places by rapids and rocks, yet these difficulties could be overcome by canals and locks, and when so overcome would leave the stream in its ordinary condition susceptible of use for general navigation purposes." (Italics supplied.)

In a footnote, the court in the Appalachian case, in referring to the Rio Grande case, said (311 U. S. 407, 61 S. Ct. 299, 85 L. ed. 253):

"* * * the record contained reports of army engineers that improvements necessary to make the river navigable would be financially, if not physically, impracticable because of the many millions of dollars that would be required. The supreme court of the Territory of New Mexico observed that 'the navigability of a river does not depend upon its susceptibility of being so improved by high engineering skill and the expenditure of vast sums of money, but

upon its natural present conditions' * * *. This Court agreed that too much improvement was necessary for the New Mexico stretch of the river to be considered navigable."

In Oklahoma v. Texas, suit was brought to determine among other things proprietary claims to 43 miles of the southerly half of the bed of the Red River, the common boundary between the states. The United States intervened and set up a claim to the river bed as against both states. Oklahoma claimed ownership of the entire bed of the river within the state, and Texas claimed the southerly half of the stretch indicated. Oklahoma contended that the river throughout its course in the state was navigable, and therefore that upon admission of the state into the Union in 1907 the title to the river bed passed from the United States to the state. The real question in this connection was whether the river was navigable in Oklahoma. In disposing of the question, the court said (258 U. S. 586, 42 S. Ct. 411, 66 L. ed. 776) :

"We find nothing in any of the matters relied on which takes the river in Oklahoma out of the settled rule in this country that navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, in its natural and ordinary condition as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

"* * * The evidence also discloses an occasional tendency to emphasize the exceptional conditions in times of temporary high water and to disregard the ordinary conditions prevailing throughout the greater part of the year."

The evidence showed that the river flows through a region where the rainfall is light, is confined to a relatively short period each year, and quickly finds its way into the river. Because of this, the river in the western half of the state does not have a continuous or dependable flow of water. It has a fall of three feet or more per mile, and for long intervals the greater part of its extensive

bed is dry sand interspersed with irregular ribbons of shallow water and occasional deeper pools. Only for short intervals, when the rainfall is running off, are the volume and depth of the water such that even very small boats could be operated therein. The river then is swift and turbulent and occasionally overflows its banks. The rises usually last from one to seven days and in the aggregate seldom cover as much as 40 days a year. In holding that part of the river not navigable, the court said (258 U. S. 591, 42 S. Ct. 413, 66 L. ed. 778):

"* * * we think it establishes that trade and travel neither do nor can move over that part of the river, in its natural and ordinary condition, according to the modes of trade and travel customary on water;—in other words, that it is neither used, nor susceptible of being used, in its natural and ordinary condition as a highway for commerce. Its characteristics are such that its use for transportation has been and must be exceptional, and confined to the irregular and short periods of temporary high water. A greater capacity for practical and beneficial use in commerce is essential to establish navigability."

In Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 86, 43 S. Ct. 60, 63, 67 L. ed. 140, 145, where the question involved was the ownership of the river bed of part of the Arkansas River in Oklahoma, the court, in disposing of the question, defined a navigable river in these words:

"A navigable river in this country is one which is used, or is susceptible of being used in its ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water." It depends "upon the fact whether the river in its natural state is such that it affords a channel for useful commerce."

United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465, involved ownership of the bed of a lake. Mud Lake in Minnesota in its natural condition covered an area of almost 5,000 acres, was three to six feet deep, and was traversed by Mud

River, which was both navigable in itself and directly connected with other navigable streams. Boats were used on its waters for travel and bringing in supplies. A ditch 30 miles long and deeper than the lake effectively drained it in 1912. Defendants insisted that the lake in its natural condition was navigable, that the state upon its admission to the Union became the owner of the lake bed, and that defendants as owners of the surrounding tracts of land had succeeded to the right of the state. The United States insisted that the lake never was more than a mere marsh and that the state never acquired any right to the lake bed. The court in holding the lake navigable said (270 U. S. 57, 46 S. Ct. 199, 70 L. ed. 469):

"* * * True, the navigation was limited, but this was because trade and travel in that vicinity were limited. In seasons of great drought there was difficulty in getting boats up the river and through the lake, but this was exceptional, the usual conditions being as just stated. Sand bars in some parts of the lake prevented boats from moving readily all over it, but the bars could be avoided by keeping the boats in the deeper parts or channels. Some years after the lake was meandered, vegetation such as grows in water got a footing in the lake and gradually came to impede the movement of boats at the end of each growing season, but offered little interference at other times."

The court cited and approved the rule of *The Montello* case, 87 U. S. (20 Wall.) 430, 439, 22 L. ed. 391, 393, and stated (270 U. S. 56, 46 S. Ct. 199, 70 L. ed. 469):

"The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats,

sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

In United States v. Utah, 283 U. S. 64, 76, 51 S. Ct. 438, 441, 75 L. ed. 844, 849, the United States brought action to quiet title to certain portions of the beds of three rivers in Utah. The court stated that the test of navigability had frequently been stated by the court, and it quoted from *The Daniel Ball* case, 77 U. S. (10 Wall.) 557, 563, 19 L. ed. 999, 1001, where the court said:

"* * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

It also cited *The Montello* case and United States v. Holt State Bank, *supra*, which we have already quoted herein. The court in holding the rivers in question navigable said (283 U. S. 87, 51 S. Ct. 445, 75 L. ed. 855):

"* * * Each determination as to navigability must stand on its own facts. In each of the cases to which the Government refers it was found that the use of the stream for purposes of transportation was exceptional, being practicable only in times of temporary high water. [Rio Grande case, Oklahoma v. Texas, and Brewer-Elliott Oil & Gas Co. case, *supra*.] In the present instance, with respect to each of the sections of the rivers found to be navigable, the master has determined upon adequate evidence that 'its susceptibility of use as a highway for commerce was not confined to exceptional conditions or short periods of temporary high water, but that during at least nine months of each year the river ordinarily was susceptible of such use as a highway for commerce.' "

In United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267, the United States claimed that certain lakes in Oregon, some

large in area but shallow in depth, were nonnavigable and that title to the lake beds therefore was not in the state. The court said (295 U. S. 6, 15, 55 S. Ct. 612, 616, 79 L. ed. 1270, 1274) :

"* * * If the waters were navigable in fact, title passed to the State upon her admission to the Union." The special master found: " 'neither trade nor travel did then [1859] or at any time since has or could or can move over said Divisions, or any of them, in their natural or ordinary conditions according to the customary modes of trade or travel over water; nor was any of them on February 14, 1859, nor has any of them since been used or susceptible of being used in the natural or ordinary condition of any of them as permanent or other highways or channels for useful or other commerce.' It is not denied that this finding embodies the appropriate tests of navigability as laid down by the decisions of this Court."

The trial court was of the opinion that the later case of United States v. Appalachian Elec. Power Co. 311 U. S. 377, 61 S. Ct. 291, 85 L. ed. 243, modified or changed the test of navigability as laid down in the cases which we have cited and quoted above. In the Appalachian case, the court recognized that navigability to determine ownership of land under water is fixed at the time of admission of the state to the Union, but that navigability for purpose of regulation of commerce may arise later, by reason of shifts and changes in population, industry, and engineering practice. The case involved the question of the necessity of acquiring a license required by the Federal Power Commission for the construction of a hydroelectric dam in the New River, which flows through Virginia and West Virginia. Such licenses are required for the construction of hydroelectric dams in navigable rivers of the United States. The navigability of the New River was, therefore, a primary question. The court said (311 U. S. 404, 61 S. Ct. 297, 85 L. ed. 251) :

"* * * The legal concept of navigability embraces both public and private interests. It is not to be determined by a formula which fits every type of stream under all circumstances and at all times. Our past decisions have taken due account of the changes and com-

plexities in the circumstances of a river. We do not purport now to lay down any single definitive test."

The court stated that the basic concept of navigability was laid down by the court in United States v. Rio Grande D. & I. Co. *supra;* Brewer-Elliott Oil & Gas Co. v. United States, *supra;* United States v. Holt State Bank, *supra;* United States v. Utah, *supra;* and United States v. Oregon, *supra,* all of which we have already cited and commented upon. But, the court continued (311 U. S. 406, 61 S. Ct. 299, 85 L. ed. 252) :

"* * * Each application of this test, however, is apt to uncover variations and refinements which require further elaboration.

\* \* \* \* \*

"To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. *'Natural and ordinary condition'* *refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken.* * * * [Italics supplied.]

"Of course there are difficulties in applying these views. Improvements that may be entirely reasonable in a thickly populated, highly developed, industrial region may have been entirely too costly for the same region in the days of the pioneers. * * * There has never been doubt that the navigability referred to in the cases was navigability despite the obstruction of falls, rapids, sand bars, carries or shifting current. * * * In determining the navigable character of the New River it is proper to consider the feasibility of interstate use after reasonable improvements which might be made.

"Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce

of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense. It is well recognized too that the navigability may be of a substantial part only of the waterway in question. Of course, these evidences of nonnavigability in whole or in part are to be appraised in totality to determine the effect of all."

Although the Appalachian case involved the question of the necessity of a license required by the Federal Power Commission for the construction of a hydroelectric dam in navigable waters of the United States, the court did discuss the question of navigability in general, and we not agree with the court in Strand v. State, 16 Wash. (2d) 107, 132 P. (2d) 1011, when it states that the United States Supreme Court in applying the rule for navigability specifically excluded cases involving title and riparian rights. In our opinion, the court intended to and did discuss navigability as applied to cases involving title and riparian rights. We are not permitted to draw distinctions between navigability for different purposes when the United States Supreme Court has not done so.

The federal criteria undoubtedly prescribe a satisfactory method for determination of the federal power under the commerce clause. But where the question presented is one of title to land, as it is here, where certainty and definiteness are highly desirable, they are not so plain and clear cut. It would be desirable, if it were possible, to suggest a test that would fit every type of stream under all circumstances and at all times. The court in the Appalachian case found it impossible to lay down any single determinative test, and in United States v. Utah, 283 U. S. 64, 87, 51 S. Ct. 438, 445, 75 L. ed. 844, 855, it said:

"* * * Each determination as to navigability must stand on its own facts."

Under the decisions of the United States Supreme Court prior to the Appalachian case, it is clear to us that the waterway in question was nonnavigable. We have discussed these cases in detail, but a

brief summary may be helpful. In the Rio Grande D. & I. Co. case, 174 U. S. 690, 19 S. Ct. 770, 43 L. ed. 1136, the court held that the mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river; that its use for any purposes of transportation has been and is exceptional and only in times of temporary high water, and that the ordinary flow of water was insufficient. In Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. ed. 771, *supra,* the court held that the part of the river in question was nonnavigable because its characteristics are such that its use for transportation has been and must be exceptional and confined to the irregular and short periods of temporary high water, and that a greater capacity for practical and beneficial use in commerce is essential to establish navigability. In the Brewer-Elliott Oil & Gas Co. case, 260 U. S. 77, 43 S. Ct. 60, 67 L. ed. 140, *supra,* the court said that a navigable river is one which is used or susceptible of being used in its ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. In the Holt State Bank case, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465, the court held that Mud Lake was navigable even though in seasons of great drought there was difficulty in getting boats up the river and through the lake, but that this condition was exceptional; and that the fact that sand bars in some parts of the lake prevented boats from moving readily all over it, which bars could be avoided by keeping boats in the deeper channels, and that water weeds impeded the movement of boats at the end of each growing season but offered little interference at other times, did not make it nonnavigable. In United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844, *supra,* in holding certain sections of rivers navigable, the court adopted the findings of the master, when he determined that the susceptibility of the waterway for commerce was not confined to exceptional conditions or to short periods of temporary high water, but that during at least nine months of the year the river was susceptible of such use as a highway for commerce. In United States v. Oregon,

295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267, *supra,* where the court held certain lakes nonnavigable, it adopted the facts as found by the special master, that neither trade nor travel did in 1859, or at any time since, had or could move over the lakes or any of them in their natural or ordinary conditions according to the customary modes of trade or travel over water, nor were any of them in 1859, nor had any of them since, been used or susceptible of being used in their natural or ordinary conditions as permanent or other highways or channels for useful or other commerce.

■ In the instant case, the waterway in question in its *natural and ordinary condition* at elevation 1313 had no flow at all from Pond A to Prairie River that would float logs, which is the only use claimed for the waterway. If there was any water at all that entered the so-called outflow, it was of small amount and for only a short period of time. Without artificial structures as proposed by the state, it was not usable for any purpose of commerce. It is therefore evident that in *its natural and ordinary condition* it was nonnavigable. With the improvements proposed—the deepening and widening of the channels from Pond A to Pond C and from Pond C to the draw or channel, and the building of sluiceways and control gates—logs could be floated out of the lake when raised to a sufficient height by the captured or impounded water for a period of three days out of a year. Under the decisions prior to the Appalachian case, 311 U. S. 377, 61 S. Ct. 291, 85 L. ed. 243, *supra,* this three-day feature alone would be sufficient to make this waterway nonnavigable. The use of the waterway for purposes of transportation would be exceptional and only in times of temporary high water, the ordinary flow of water being insufficient. A greater capacity for practical and beneficial use would be essential to establish navigability. The susceptibility of this waterway for use as a highway of commerce for only that short period of time did not qualify it as navigable water under the earlier cases.

The question then arises whether the Appalachian decision warrants or compels a different result. The court in that case said, and we are repeating (311 U. S. 407, 61 S. Ct. 299, 85 L. ed. 252) :

354

"To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural and ordinary condition' refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken."

A wholly artificial waterway which would have sufficient volume of water, the proper gradient, and regularity of flow, of course, would not qualify as a navigable waterway with the legal incidents of ownership of bed or riparian rights, such as is involved in the cases which have been cited. But a natural waterway, under the Appalachian decision, which has sufficient volume of water, proper gradient, and regularity of flow, is not barred from the classification as being navigable, *if otherwise suitable,* merely because artificial aids must be installed to make the highway suitable for commercial navigation. With that formula in mind, we must analyze our facts.

Here, the proper gradient from the outflow point does not now exist. There must be a deepening. To create a sufficient supply of water for the floating out of logs, the water will have to be captured and impounded at the time of the spring thaw and rains from a watershed of only 1.15 square miles or 725 acres and which has a yield of only three-tenths of one cubic foot per second from all sources—precipitation, seepage, and percolation—and in many years the water supply would not suffice to offset evaporation. A waterway otherwise suitable for navigation is not barred from the classification because artificial aids are needed to make it suitable for uses of commerce, but there must exist a volume of water sufficient to render it capable of use as a highway of commerce, and a natural gradient, and a regularity of flow. The state suggests that artificial aids do not destroy navigability. They do not. But can they create navigability where the waterway itself is not otherwise suitable for commerce? The Appalachian decision by its facts involved im-

provement within a waterway otherwise suitable for navigation. In that decision, the findings show that the volume of water passing through the New River over an extended period would be sufficient for the purposes of substantial navigation, provided other conditions should make it available for that purpose.

Here, the purpose of the dam would be primarily to capture and impound the water from the 725-acre catchment in order to get a sufficient supply to float out logs for three days a year. It would seem that the situation is no different than if Pond A had been just a saucer-like depression and that water from spring thaws and freshets would be impounded in sufficient quantity to float out logs with or without artificial aids.

If in this proceeding the title to the bed of the draw or channel between the runoff point and the Prairie River were the only property involved, the situation would be more apparent. The state admits that the whole stretch of the so-called waterway from Pond A down to Prairie River must be classified as navigable. It seems unreasonable to assert that the channel is otherwise suitable for navigation, and that the installation of artificial aids does not bar it from the classification of navigability. The usefulness of the waterway from Pond A to the Prairie River depends on construction which would not only reduce the barriers but would also completely transform the waterway, in fact, create it. We conclude that a waterway which on May 11, 1858, had a capacity for floating logs only at high water, impounded from spring thaws and freshets, and then only with the aid of dams and sluiceways, and in that event only with difficulty for three days in a normal year, was not navigable, and that the title to the bed of Pond A did not vest in the state by virtue of its admission to the Union.

In view of our determination as above, there is no necessity to discuss or decide the other issues raised.

That part of the amended order and decree of registration appealed from is reversed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On September 5, 1952, the following opinion was filed:

PER CURIAM.

In the case at bar, the state was asserting title to a lake bed and the iron ore lying thereunder upon the theory that the waters of the lake or pond (known as Pond A) were navigable at the time this state was admitted to the Union.

This was a registration proceeding in which the state was named as a party defendant and elected to file an answer asserting title to the bed of Pond A. We held that Pond A was not navigable at the determinative time and that the state had no title to the bed of the pond.

The clerk of this court took the position that the state was involved in the case in its proprietary, not its sovereign, capacity and, upon application, taxed costs and disbursements against the state.

In our opinion, the case falls clearly within the rule announced in State v. McCoy, 228 Minn. 420, 425, 38 N. W. (2d) 386, 389, our latest adjudication upon the subject, in which we held that costs and disbursements were taxable against the state where it was, as here, acting in its proprietary capacity in unsuccessfully claiming title to certain bank deposits which it alleged had been abandoned by the depositors and which it claimed had, consequently, escheated to the state. We held there, following State v. Buckman, 95 Minn. 272, 104 N. W. 240, 289, and State v. Fullerton, 124 Minn. 151, 144 N. W. 755, that, in cases where the state unsuccessfully asserted its proprietary interests, costs and disbursements were taxable against it. In the Buckman case, the state unsuccessfully sought recovery for alleged trespass on lands it alleged were owned by it. In the Fullerton case, it unsuccessfully sought recovery of funds from the secretary and treasurer of the board of medical examiners.

In State ex rel. Smiley v. Holm, 186 Minn. 331, 243 N. W. 133, Mr. Chief Justice Wilson, speaking for the court, held that the secretary of state was there acting for the state in its sovereign

capacity, but discussed at length the distinction between the state's proprietary and sovereign capacity and cited and discussed all the cases theretofore decided by this court. He there said (186 Minn. 332, 243 N. W. 133):

"* * * It is only in exceptional cases that the state is liable for costs and disbursements. While acting in its sovereign character it is immune; but *when it descends to the level of those with whom it associates and interests itself in property and proprietary rights as distinguished from governmental prerogatives, it subjects itself to the same liability for costs and disbursements as any litigant.* The statute which allows costs and disbursements 'in every action,' G. S. 1923 (2 Mason, 1927) § 9473, is subject to this exception in favor of sovereignty." (Italics supplied.)

This language was quoted with approval in State v. McCoy, *supra,* our latest pronouncement of the rule.

State, by Peterson, v. Bentley, 224 Minn. 244, 28 N. W. (2d) 179, 770, cited by the state, was a condemnation proceeding where M. S. A. 117.20(2) was not applicable and the state was acting in its sovereign, not its proprietary, capacity.

The clerk's taxation is affirmed.