# STATE, BY J. A. A. BURNQUIST, ATTORNEY GENERAL, v. WILLIAM M. BOLLENBACH AND OTHERS.[1]

January 29, 1954.

No. 36,086.

---

[1]Reported in 63 N. W. (2d) 278.

*J. A. A. Burnquist,* Attorney General, *John H. Burwell,* Assistant Attorney General, and *Thomas M. Quayle,* Special Assistant Attorney General, for the State.

*Mandt Torrison, Chester Rosengren, Bundlie, Kelley, Finley & Maun* and *Rosengren & Rufer*, for respondents.

CHRISTIANSON, JUSTICE.

In October 1949 the attorney general, upon the request of the commissioner of conservation, filed a petition in the district court for Otter Tail county seeking to acquire by condemnation an easement over private property for the purpose of establishing and maintaining a public right of way for ingress to and egress from Five Lake located in Otter Tail county. The petition also called for the acquisition of a tract of land not to exceed five acres situated on the north shore of Five Lake and adjoining the proposed easement for use as a public camping and parking area. The proceedings were brought under M. S. A. 1949, § 97.48, subd. 15, which provides:

"The commissioner shall acquire by * * * condemnation in the manner prescribed by section 117.20, in the name of the state, * * * parking or camping areas of not to exceed five acres, adjacent to public waters to which the public theretofore had no access or where the access is inadequate and upon which the public has a right to hunt and fish, and such easements and rights of way as may be required to connect such areas with public highways, provided, no acquisition costing over $1,000 shall be made without first obtaining the approval of the executive council, and provided further that the authority herein granted shall not extend to * * * lakes which are unmeandered or which contain less than 200 acres within the meander lines."

Objections to the petition were filed by respondent William M. Bollenbach, the sole owner in fee simple of all the riparian land surrounding Five Lake since 1943, on several grounds which in substance were that the statutory requirements for condemnation did not exist and particularly that Five Lake was not a navigable public body of water. Trial was commenced on March 10, 1952, before the court without a jury. At the conclusion of all the evidence offered in support of the petition, respondent Bollenbach moved under Rule 41.02 of the Rules of Civil Procedure to dismiss the petition

with leave reserved to submit evidence at a later date if his motion was denied. The trial court took the motion under advisement and thereafter filed detailed findings of fact and conclusions of law and ordered that judgment of dismissal with prejudice be entered. Petitioner thereafter moved to amend the trial court's findings of fact, conclusions of law, and order for judgment or, if that motion were denied, in the alternative for a new trial. Appeal is taken from the order denying this alternative motion.[2]

Five Lake is located in section 5 of Hobart township in Otter Tail county. It is one of a group of small lakes lying in the north end of that county. It is a glacially formed meandered lake with a maximum length of about one mile and a maximum width of about one-half a mile. Although there is some dispute as to whether there were 200 acres of water area within the meander lines of the lake at the time of filing the condemnation petition in 1949, the evidence is clear that in the spring of 1948 there were 228 acres of water area within its meander lines. The lake is largely open water, but it also contains some weeded areas. The shore line was described as being composed of steep banks except for low marshy portions on the east and south sides of the lake. The evidence further discloses that most of the shore line has a thin fringe of rushes, cattails, and rice. The lake contains areas of substantial water depth approximately 40 feet in places. Five Lake has no inlet. Situated to the east of Five Lake is Fairy Lake, sometimes called Four Lake. It is a small grassy pond which possibly at some time had a water connection with Five Lake. To the west of Five Lake a short distance lies Lake Six; and to the south of Lake Six and southwest of Lake Five lies Lake Seven, also known as Scalp Lake. Five Lake, Lake Six, and Scalp Lake are very similar in area and geological characteristics and are situated in a fairly wooded region composed principally of hardwood. There is not and never has been a water con-

---

[2]While only that part of the order denying a new trial is reviewable on this appeal, any finding of fact may be challenged as not sustained by the evidence on such review. Graphic Arts Educational Foundation, Inc. v. State, 240 Minn. 143, 144, 59 N. W. (2d) 841, 843, and cases there cited.

nection between Five Lake and Lake Six; however, there is a small connecting creek between Lake Six and Scalp Lake.

Although there is considerable dispute concerning whether Five Lake has an outlet and whether it has ever had a water connection with Scalp Lake, which questions will be considered in detail later, the evidence is clear and uncontradicted that at the south end of Five Lake there is a combination wild hay and grass meadow and marshy area which was generally termed a swale. This swale extends southeasterly to a small pond called Little Mud or Pickerel Lake and then westerly to Scalp Lake. There was testimony that at particular times in the past wild hay has been cut, and cattle, sheep, and possibly horses have been pastured, on the section of the swale between Five Lake and Little Mud Lake. At all times within the memories of the oldest settlers produced as witnesses at the trial, a road has passed across the swale between Lake Five and Scalp Lake. The road has in the past been corduroyed because of the soft wet terrain over which it passed, but recently the road has been improved and a 16-inch culvert inserted to carry water in the swale from one side of the road to the other. Automobiles have been used on the road ever since their advent as a means of transportation. Before that time, team and wagon traffic used the road, and the oldest settler called as a witness could not recall any time when the road was not usable for such a purpose.

Scalp Lake has a small creek as an outlet running to the southeast, and it discharges its surplus water through a series of other lakes joined by connecting creeks eventually flowing into the Otter Tail River, which, in turn, discharges its water through a series of lakes culminating in the Red River of the North at Breckenridge. There is no evidence that any of the connecting creeks or lakes are navigable or that they have been used or are capable of being used for useful travel or floatage of logs, the only evidence on their use and condition being that at some point below the outlet of Scalp Lake the creek was only 48 inches in width and flowed through a spruce swamp. Five Lake is not and has not been connected with

other lakes or streams by any well-defined portage or trail used as a carrying place for boats.

Five Lake contains several species of fish and at times supports some ducks. Prior to the acquisition of the property surrounding the lake by respondent Bollenbach, a substantial number of local residents and others fished and hunted on Five Lake both by boat and from the shore. At the present time, the only boats on the lake are three or four rowboats maintained by respondent Bollenbach which are at times rented and also used by guests for fishing purposes. Indians fished, hunted, and trapped on Five Lake and the surrounding lakes and also used their birchbark canoes to carry fish, fur, maple syrup, and snakeroot which they in some instances sold. They were at times observed by an old settler canoeing on Five Lake, and in at least one instance they were carrying furs. In the 1870's there was a sawmill situated northwest of Scalp Lake. Logs cut in the area were sometimes rafted to the sawmill across Scalp Lake or from Lake Six to Scalp Lake. Five Lake, however, has never been used for logging purposes.

The trial court, on the sole basis of evidence which was presented by petitioner, except for two exhibits, one of which was a copy of one-half of one of petitioner's exhibits, offered into evidence by respondents during cross-examination of petitioner's witnesses, found that Five Lake was not navigable in 1858, the date Minnesota was admitted to the Union; and it, therefore, concluded that Five Lake was not a public water upon which the public has a right to hunt and fish. Petitioner takes the position that its evidence sufficiently established the right of the public to hunt and fish on Five Lake, and, in effect, asserts that the trial court's findings of fact and conclusions of law are against the great preponderance of the evidence and contrary to law.

■ We are confronted at the outset with petitioner's contention that an order granting judgment of dismissal on the merits is similar to a directed verdict and that thus our task on appeal is merely that of reviewing the evidence in the light most favorable to petitioner in order to determine whether a prima facie case was estab-

lished under § 97.48, subd. 15. This position, however, is untenable particularly since the adoption of the new rules of civil procedure under which this case was tried. It is clear from the language of Rules 41.02 and 52.01 that the trial court in granting a judgment of dismissal on the merits is required to make findings of fact and conclusions of law, and its findings are not to be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.[3] The federal courts have taken this view under Rules 41 (b) and 52 of the Federal Rules of Civil Procedure, which are substantially the same as the comparable Minnesota rules.[4]

In reviewing findings of fact, the rule in this state prior to the adoption of the new rules of civil procedure has been that the findings must be upheld if they are reasonably sustained in the light of the evidence as a whole. 1 Dunnell, Dig. (3 ed.) § 411. Although now, by virtue of Rule 52.01, the criterion for review is whether or not the findings are clearly erroneous, there is no practical change

---

[3]Rule 41.02 of Rules of Civil Procedure, provides that: "* * * If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52.01." Rule 52.01 states: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. * * * Findings of fact and conclusions of law are unnecessary on decisions of motions * * * except as provided in Rule 41.02."

[4]United States v. United States Gypsum Co. 333 U. S. 364, 395, 68 S. Ct. 525, 542, 92 L. ed. 746, 766; Chicago & N. W. Ry. Co. v. Froehling Supply Co. (7 Cir.) 179 F. (2d) 133. Prior to 1948, the Federal Rules of Civil Procedure were unclear on whether the trial court could make findings of fact after a dismissal on the merits, and there was a resulting conflict in the federal circuit courts on that issue. See, Reich v. Vegex, Inc. (3 Cir.) 137 F. (2d) 647; Schad v. Twentieth Century-Fox Film Corp. (3 Cir.) 136 F. (2d) 991; Young v. United States (9 Cir.) 111 F. (2d) 823; Gary Theatre Co. v. Columbia Pictures Corp. (7 Cir.) 120 F. (2d) 891. However, the Federal Rules of Civil Procedure were amended in 1946, effective March 19, 1948, so as to require findings of fact and conclusions of law upon a dismissal on the merits under Rule 41 (b) of Federal Rules of Civil Procedure. See, 5 Moore, Federal Practice (2 ed.) 1044 to 1046. The new Minnesota rules of civil procedure adopt the relevant parts of the federal rules as amended.

in the method of review of findings of fact nor was one intended. 2 Youngquist & Blacik, Minnesota Rules Practice, p. 648.

We have made a thorough examination of the record in the light of the particular findings of fact challenged by petitioner. The findings contain certain assertions which find no support in the evidence and are thus clearly erroneous. Also in some instances the trial court failed to make findings regarding facts which could not be rejected since they were undisputed, reasonable, not inconsistent or improbable, and had been testified to by wholly unimpeached witnesses. Roberts v. Metropolitan L. Ins. Co. 215 Minn. 300, 9 N. D. (2d) 730; O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430. However, since neither the erroneous findings nor the omitted facts could be considered as controlling in view of the theory upon which the case was tried and submitted to the court below, the errors are harmless and do not necessitate a reversal nor would any useful purpose be served by remanding the case for corrected or additional findings. 1 Dunnell, Dig. (3 ed.) § 422.

Our presentation of the facts above embodies those findings of fact which are clearly sustained by the evidence together with the findings as corrected and conclusively proved facts just considered. There are, however, certain findings made by the trial court which because of their importance must be more closely examined to determine whether they are reasonably sustained by the evidence.

In the first place, the trial court found as a fact that Five Lake has no outlet. There was testimony by two expert witnesses, one being Sidney A. Frellsen, who at the time of the trial was director of the division of waters in the Minnesota department of conservation and an expert in the field of hydraulics and hydraulic engineering, and the other being Adolph S. Meyer, a consulting hydraulic engineer, to the effect that Five Lake has an outlet as evidenced by a V-shaped depression in the ice-formed ridge which confines the lake on the south side. Frellsen also testified that there was a natural outflow channel from Five Lake southwest to Scalp Lake and eventually to the Red River of the North. However, Frellsen did testify that when he visited the lake in June 1948 the so-called

outlet was dry and not accessible by boat, the elevation of the V-shaped depression, which was 1361.6 vertical feet above sea sevel, being one and three-tenths vertical feet higher than the water elevation of Five Lake at that time. The water elevation of Five Lake in November 1949, shortly after the time the petition for condemnation was filed, was 1359.0 vertical feet above sea level, which was one vertical foot lower than the water elevation of Five Lake in June 1948 and consequently two and three-tenths vertical feet below the elevation of the V-shaped depression. The water elevation at the time of trial in March 1952 was 1360.2 vertical feet above sea level and consequently one and four-tenths vertical feet below the elevation of the V-shaped depression. There was evidence that both in June 1948 and November 1949 there was water in the swale below the outlet; that in the past water had flowed through the outlet; and that during periods of drouth outlets in lakes tend to build up and during high water they are washed away. Nevertheless, in light of the uncontroverted evidence that the V-shaped depression was dry in June 1948 and the absence of evidence to indicate there had been any change in this respect in November 1949 and March 1952 and the fact that the findings clearly indicate that the trial court used the term "outlet" only in the sense of presently having a water connection with another lake, we cannot say that the finding that Five Lake has no outlet was manifestly contrary to the evidence and thus clearly erroneous.

The trial court also found that in times of extreme high water the swale between Lake Five and Scalp Lake has been flooded to a point where it may have been possible to float a birchbark canoe but that there was no evidence upon which the court could find that such flooding was regular or recurrent or periodic. Further, the findings were that the swale did not afford a water connection at periods of normal water elevation nor did it afford a usable water connection with Scalp Lake in periods of extreme high water. It was testified by Alexander Chilton, who was 86 years old and a resident in Otter Tail county since 1870, that the present water levels of lakes in the area in question, including Five Lake, are lower than

when he first lived in the vicinity. He stated that during the average season or in times of drouth the depth of water in the swale between Five Lake and Scalp Lake was two and one-half to three feet but that the depth of water was four to five feet in periods of high water. He testified that in times of high water, which was usually in the spring but which could be after a heavy rainfall, he saw Indians travel by birchbark canoes from Five Lake to Scalp Lake carrying furs, sugar, and fish but that in dry years it was not possible to travel by canoe between Five Lake and Scalp Lake. His testimony further revealed that, although his father owned a boat on Scalp Lake and he frequently fished by boat on Five Lake, he never navigated his boat between the two lakes via the swale and indicated that even in high water he could not have done so.

Dewey Antonsen, who was 52 years old and who had lived in Hobart township all his life, testified that when he was a boy of about 12 or 14 the water level of Five Lake was four or five feet higher than now and this was the year round and not only in the spring;[5] that the water level of Scalp Lake was five to six feet higher at that time than presently; and that at that same time the average water depth in the swale was around three to four feet. He also testified that there was a creek through which water flowed between Five Lake and Scalp Lake; that in the springtime the water flooded over the creek bank; that at the present time the creek is still in existence which accounts for the installation of the culvert under the road passing between Five Lake and Scalp Lake; but that at times the culvert is dry. He further testified that there was a boat in Little Mud Lake which was used for fishing; that the water was high enough to row this boat from Little Mud Lake to Scalp Lake

[5]This testimony is inconsistent with petitioner's exhibit E, a topographical map of the Minnesota Vergas Quadrangle and Minnesota Perham Quadrangle made from a survey conducted in 1912 by the United States Department of Interior in co-operation with the state of Minnesota showing that the surface elevation of Lake Five in 1912 was 1360 vertical feet above sea level, which was three-tenths of a foot lower than the water elevation of Lake Five in June 1948 and two-tenths of a foot lower than its elevation at the time of trial.

and from Little Mud Lake to the road but he never did it and never saw it done; and that he never saw a boat go between Five Lake and Scalp Lake.

Frellsen testified that during his visits to the lake he found several indications of high-water marks as evidenced by an old beach line and water marks on trees and boulders. The extreme high-water mark was at 1364.5 vertical feet above sea level, and there were others at 1363.1, 1363.5, 1363.7, 1362.4, and 1363.9, which can be compared with the established water elevations of Five Lake of 1360.0 in 1912, 1360.3 in June 1948, 1359.0 in November 1949, 1360.2 in March 1952, and the elevation of 1361.6 in June 1948 of the V-shaped depression at the south side of the lake. On cross-examination, he disclosed that he was without knowledge of when these extreme high-water marks were made and that all could have been made at the same time. Frellsen testified that during one of his visits to the territory there was water in the swale and a slight flow of water in the culvert but the marsh was so dense that he was unable to observe Scalp Lake. Frellsen also stated that in his opinion the water level of Five Lake was higher in 1871 than at the present time.

Meyer testified that when he visited Five Lake in November 1949 there was standing water in the swale between Five Lake and Little Mud Lake, which he said indicated a great deal of seepage and feeding ground water, but there was little water in the culvert.

Various rainfall tables were introduced into evidence in order to serve as a means of comparing the water elevations of Five Lake in 1858, 1871, and 1912. Opinion evidence of the water elevation in these years, based on the precipitation tables, was in the main rejected as being without foundation and not proper testimony for an expert; however, Frellsen did testify that Five Lake was probably a little higher in 1871 than 1858. There was introduced into evidence a topographic map of the Minnesota Vergas Quadrangle and Minnesota Perham Quadrangle made from a survey conducted in 1912 by the United States Department of Interior in co-operation with the state of Minnesota, which indicated symbolically a marshy area

running from Five Lake to Little Mud Lake and from Little Mud Lake to Scalp Lake, but there was no sign of a creek or stream between Five Lake and Scalp Lake. Also part of the evidence was a photostatic copy of the original 1871 government survey of the area in controversy. This map gave no indication of a flow of water between Five Lake and Scalp Lake; however, Frellsen testified that this can be explained because no reference is made to creeks or swamps which are not crossed on the surveyor's section line and that was the situation with regard to the swale between Five Lake and Scalp Lake.

It can readily be seen from this examination of the evidence that, for the most part, the findings of the trial court pertaining to the possible water connection between Five Lake and Scalp Lake are clearly supported by the evidence. The only portion of the findings which can be seriously questioned is that which says that the swale did not afford a usable water connection with Scalp Lake in periods of extreme high water. Chilton testified that he saw Indians travel from Five Lake to Scalp Lake in periods of high water; however, this one old settler was the only witness to such travel and, further, there is no testimony as to how often or in what years this travel took place. It was also stated by Chilton that the Indians used very light birchbark canoes which, in his own words, "would go in almost any kind of water." In addition, Chilton testified that he had never rowed a boat between Five Lake and Scalp Lake, and his testimony indicated that he could not have done so if he had tried. It must also be noted that a road has passed between Five Lake and Scalp Lake as long as anyone can remember and that Dewey Antonsen testified that in his 52 years in the area he never saw a boat traverse the swale in question. In view of this evidence, we cannot say that the finding of the trial court was manifestly against the weight of the evidence.

The trial court, in what may be termed the finding of the ultimate facts, found as follows:

"X.

"Five Lake was not navigable in fact in 1858, at the time of the State's admission to the Union. It was not used as a highway for commerce or travel. It has never been used for purposes of commerce or travel since the admission of Minnesota to the Union, nor has it at any time been capable or susceptible of such use.

"XI.

"Respondent Bollenbach is the owner of the fee to the bed of the lake by virtue of his acquisition of the fee to the riparian lands. The waters contained upon such bed are private waters, upon which the public does not have the right to hunt and fish except by permission of the owner."

Before considering whether these findings of fact are supported by the evidence in light of the legal principles involved, it is necessary to understand the theory upon which petitioner tried and submitted its case to the trial court.

■ The right to hunt and fish is an incident of ownership of soil. L. Realty Co. v. Johnson, 92 Minn. 363, 100 N. W. 94, 66 L. R. A. 439; Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222; 8 Dunnell, Dig. (3 ed.) § 3934. This rule is well stated in Lamprey v. Danz, 86 Minn. 317, 321, 90 N. W. 578, 580, where this court said:

"It is elementary that every person has exclusive dominion over the soil which he absolutely owns; hence such an owner of land has the exclusive right of hunting and fishing on his land, and the waters covering it. Therefore the precise question in this case is whether the facts in this case show that the plaintiff is the absolute owner of the soil beneath the waters of Howard Lake. If his ownership thereof is not qualified by any right in the state in trust for the public, he has the same absolute supremacy over such waters as if they were solid land."

■ The ownership of the soil under most bodies of water in the state of Minnesota is determined by whether or not the body of water was navigable on May 11, 1858, the date this state was admitted to the Union. The state of Minnesota, upon admission to the

Union, became vested with title in trust for the public to the beds of all waters then navigable and not previously granted by the United States, subject to the paramount power over such waters by the United States as a result of its power to regulate interstate commerce. State v. Longyear Holding Co. 224 Minn. 451, 29 N. W. (2d) 657; Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 342, 54 N. W. (2d) 912, 918, and cases cited therein. The title to the beds of water not navigable at the time of the admission of the state of Minnesota to the Union and not previously patented remained in the United States and passed by subsequent patent to the purchaser of the riparian upland unless specifically reserved in the United States by the act of conveyance. United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267; Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 54 N. W. (2d) 912; cf. Shell v. Matteson, 81 Minn. 38, 83 N. W. 491.

■ Navigability for purposes of determining title to water beds is a federal question controlled by the federal test of navigability. United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844; County of Becker v. Shevlin Land Co. 186 Minn. 401, 243 N. W. 433; State v. Longyear Holding Co. 224 Minn. 451, 29 N. W. (2d) 657.

The federal test of navigability is propounded in United States v. Holt State Bank, 270 U. S. 49, 56, 46 S. Ct. 197, 199, 70 L. ed. 465, 469, as follows:

"The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

Besides the federal test of navigability, Minnesota has a state test of navigability which originated in dicta of Mr. Justice Mitchell in Lamprey v. State, 52 Minn. 181, 199, 53 N. W. 1139, 1143, 18 L. R. A. 670, where this court said:

"* * * Most of the definitions of 'navigability' in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.

"Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used * * * by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes * * *. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated."

Prior to the decision in County of Becker v. Shevlin Land Co. 186 Minn. 401, 243 N. W. 433, which held the Otter Tail River navigable under the federal test, the *Lamprey* test was the sole criterion employed by this court to determine the ownership of the beds underlying waters in this state and the rights of the public to use those waters.[6] However, it is now clearly the law that the determination of whether a water bed passed to a state upon its admission to the

[6]See, Shell v. Matteson, 81 Minn. 38, 83 N. W. 491; Lamprey v. Danz, 86 Minn. 317, 90 N. W. 578; State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139.

Union and the nature and extent of the title conveyed by the original patents from the United States to riparian landholders is a federal question and not an issue to be resolved by local law.[7] Since in the instant case all the riparian land surrounding Five Lake was conveyed originally by patent from the United States to the Northern Pacific Railway Company and through various mesne conveyances eventually transferred in fee to the respondent Bollenbach, it is clear the *Lamprey* test has no applicability. It may be, however, that the *Lamprey* test of public waters still has importance in a situation where the state of Minnesota conveys to a private party riparian land which was granted to it by the United States after admission to the Union and which borders a body of water non-navigable by the federal test of navigability.[8] But, since these are not the circumstances in the instant case, we need not pass on the applicability of the *Lamprey* test to such a situation. Petitioner suggests that the *Lamprey* test of public waters is reconcilable and consistent with the federal test as stated in United States v. Holt State Bank, *supra*. That this is clearly erroneous will become evident shortly as the federal test of navigability is considered in more detail.

Thus the issue in its simplest terms is whether, under the federal test, the evidence sufficiently established Five Lake to be navigable in fact in 1858, for, if it was not navigable in fact at that time, it conclusively and correctly follows that Five Lake is not navigable at law; that respondent Bollenbach is the owner of the fee to the bed of Five Lake; and that those waters are private waters upon which the public has no right to hunt and fish.

■ In determining whether a body of water was navigable in 1858, the year Minnesota entered the Union, the court can consider

---

[7]See, Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 67 L. ed. 140; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844; United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267.

[8]See, 3 American Law of Property, § 12.30; Bade, *Title, Points and Lines in Lakes and Streams*, 24 Minn. L. Rev. 305, 325.

evidence of the present use and capacity for purposes of navigation as bearing on whether it was navigable at that time. United States v. Utah, 283 U. S. 64, 82, 51 S. Ct. 438, 443, 75 L. ed. 844, 853. In the instant case, there was no evidence directly concerning trade or travel or possibilities for such activity on Five Lake in 1858, apparently because no witnesses to events at that time are now alive and no record of events on Five Lake were ever kept. However, this does not prevent a determination that Five Lake was in fact navigable in 1858.

Consideration must first be given to whether Five Lake has ever been used in its natural and ordinary condition as a highway of commerce over which trade and travel were conducted since the time Minnesota was admitted to the Union. This involves primarily a question of the quantity and frequency of trade and travel necessary to establish a body of water as a highway for useful commerce. It is clear that, if a lake is the mere widening of a river which was used as an old route for fur trappers and traders, it is part of a navigable watercourse. State v. Longyear Holding Co. 224 Minn. 451, 29 N. W. (2d) 657. That a waterway need not necessarily be the principal organ in the area for trade and travel, however, is made evident in United States v. Appalachian Elec. Power Co. 311 U. S. 377, 409, 61 S. Ct. 291, 300, 85 L. ed. 243, 254, where the United States Supreme Court said:

"Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce of the region is sufficient."

In the instant case, there is evidence that Indians were seen carrying furs by canoe on Five Lake and between Five Lake and Scalp Lake in times of high water, but there is no evidence that the goods were being carried to market or were being transported for any use but the personal use of the Indians. There was no evidence that Indians frequently used Five Lake for their travel nor was there any evidence that Five Lake was a part of any trade route.

Further, the trial court found as a fact that Five Lake had no usable water connection with any other lakes even at periods of extreme high water. Although a finding of use as a highway for commerce is not dependent upon the positive existence of all of the above elements, we cannot say as a matter of law that the evidence in this case compels a finding of use as a highway for useful commerce. The only uses ever made of Five Lake, besides the travel by Indians mentioned above, have been for private fishing and hunting and some trapping by the Indians. However, such activities are not commerce and provide no basis for finding that a body of water is navigable under the federal test.[9]

Although Five Lake has not been used as a highway for useful commerce, it could still be deemed navigable in 1858 if at that time it was in its natural and ordinary condition susceptible of such use. The susceptibility of a body of water for use as a highway for useful commerce is determined mainly by two factors: (1) Whether the body of water has physical characteristics which permit and are conducive to water travel; and (2) whether the body of water is situated in a location useful to commercial trade and travel. There is no question that in the instant case the first factor is satisfied because the water depth of Five Lake, being 40 feet in spots, and its length and width, being approximately one mile by one-half mile, demonstrate a sufficient physical capacity for water trade and travel. Further, there is no evidence of any abnormal vegetation or other obstructions being present in the lake. But whether Five Lake is geographically located so as to be classed as susceptible for use as a highway of commerce is not so easily ascertained. Of course, any body of water deep enough and large enough to float a boat is theoretically susceptible to being used for trade or travel. However, for purposes of determining navigability under the federal test, it is only those lakes and streams with a reasonable and practical possibility of future utility which are susceptible to use as a high-

[9]United States v. Oregon, 295 U. S. 1, 55 S. Ct. 610, 79 L. ed. 1267; United States v. Ladley (D. Idaho) 42 F. (2d) 474; Toledo Liberal Shooting Co. v. Erie Shooting Club (6 Cir.) 90 F. 680.

way for commerce. In the much cited case of Harrison v. Fite (8 Cir.) 148 F. 781, 783, the circuit court of appeals said:

"To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. * * * Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation."

In Taylor Fishing Club v. Hammett (Tex. Civ. App.) 88 S. W. (2d) 127, 129, error dismissed, the Texas court, in holding not navigable under the federal test an inland lake which was one and one-half miles long, 700 feet wide, with an average depth of 15 feet, and which in times of high water was connected with a creek and river, said:

"* * * Every inland lake or pond that has the capacity to float a boat is not necessarily navigable. It must be of such size and so situated as to be generally and commonly useful as a highway for transportation of goods or passengers between the points connected thereby. It must either alone or in connection with other bodies of water connect points between which it is practical to transport commerce by water. 45 C. J. 414; Proctor v. Sim, 134 Wash. 606, 236 P. 114; Hodges v. Williams, 95 N. C. 331, 59 Am. Rep. 242; Chisholm v. Caines (C. C.) 67 F. 285, 293; Griffith v. Holman, 23 Wash. 347, 63 P. 239, 54 L. R. A. 178, 83 Am. St. Rep. 821; Giddings v. Rogalewski, 192 Mich. 319, 158 N. W. 951; Economy Light & Power Co. v. United States (C. C. A.) 256 F. 792; Lembeck v. Nye, 47 Ohio St. 336, 24 N. E. 686, 8 L. R. A. 578, 21 Am. St. Rep. 828."

In the instant case, there is no evidence that there has ever been, since this state was admitted to the Union, any type of village or settlement on or reasonably near the shores of Five Lake. In fact, the only evidence of any kind of commercial enterprises in that vicinity in the past or present was the renting of boats for fishing and the existence in the 1870's of a sawmill near the northwest corner of Scalp Lake. Since the shores of Five Lake are in a fairly wooded area, it is possible that a sawmill could have been or may sometime in the future be established on the shores of Five Lake and the lake used to float the logs to the sawmill. Such a commercial use, however, is strictly theoretical with little practical possibility of realization, and, further, it is doubtful whether any practical commercial purpose would be served by floating logs across the lake. See, Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 336, 54 N. W. (2d) 912, 914. With the nonexistence of important commercial activity in the immediate vicinity of Five Lake, trade and travel both commencing and terminating on the shores of that lake are necessarily without destination in the channels of commerce, and any substantial change in the future is highly speculative and without reasonable foundation in fact. It is thus evident that Five Lake, when considered as a unit in itself without connection with other waters, has never been situated so as to offer any practical possibility of use as a channel for useful commerce.

When consideration is given to the relationship of Five Lake with the surrounding lakes and streams, it likewise becomes apparent that the trial court reasonably could have found Five Lake not susceptible to use as a link in a navigable watercourse. Five Lake has no outlet nor has there been any connection with other waters by portage or trail over which trade could have been conducted. There has been no water connection with Scalp Lake in times of normal water elevation, and even in times of extremely high water level there was no useful water connection between Five Lake and Scalp Lake. In addition, the evidence failed to establish any type of navigable water channel between Scalp Lake and adjoining lakes.

In view of these facts and the other evidence we have already discussed concerning the use and susceptibility to use of Five Lake as a highway for useful commerce, we cannot say as a matter of law that Five Lake was in fact navigable in 1858 or that the ultimate facts found by the trial court are clearly erroneous. It therefore follows from the principles of law previously discussed that, the title to the bed of Five Lake being in respondent Bollenbach, the lake is not a public body of water upon which the public has a right to hunt and fish.

■ Petitioner, in what may aptly be termed an afterthought, presents the argument that the right to hunt and fish, being an interest in real estate, may be, and was in this case shown to be, dedicated to public use for those purposes. This theory, however, as respondent points out, was never advanced or litigated in the trial court and, therefore, should not be considered for the first time on appeal. 1 Dunnell, Dig. (3 ed.) § 384, and cases cited therein. Furthermore, as respondent contends, the evidence is insufficient to support such a theory. Although the record in the instant case fails to support the essential elements of a common-law dedication, it may well be that in the future a public right to hunt and fish on some of the small inland lakes of this state can be grounded on a theory of dedication[10] or perhaps on a theory of estoppel or prescriptive right in the public for such purpose.[11]

■ In addition to questioning the trial court's findings of fact, petitioner assigns as prejudicial error the exclusion of expert opinion testimony by both Frellsen and Meyer regarding the issue of navigability. No particular questions or testimony are alluded to in petitioner's brief or assignments of error as being erroneous; there is no argument on the admissibility of such testimony presented in petitioner's briefs; nor is the subject presented by petitoner's state-

[10]See, Lembeck v. Nye, 47 Ohio St. 336, 24 N. E. 686, 8 L. R. A. 578; Village of Pewaukee v. Savoy, 103 Wis. 271, 79 N. W. 436, 50 L. R. A. 836; 3 American Law of Property, § 12.132.

[11]See, Attorney General v. Ellis, 198 Mass. 91, 84 N. E. 430, 15 L.R.A. (N.S.) 1120; Attorney General ex rel. Director of Conservation v. Taggart, 306 Mich. 432, 11 N. W. (2d) 193.

ment of the questions involved on the appeal. In oral argument before this court, petitioner made a general reference to this assignment of error and conceded that the admissibility of such testimony was discretionary with the trial court. Respondent, in both his brief and oral argument, maintained that, since the point had not been argued in petitioner's briefs, it had been waived, citing Raymond v. McKenzie, 220 Minn. 234, 19 N. W. (2d) 423. The rule is that an assignment of error based on mere assertion and not supported by any argument or authorities is deemed waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection. Kaehler v. Kaehler, 219 Minn. 536, 18 N. W. (2d) 312; 1 Dunnell, Dig. (3 ed.) § 366. No abuse of discretion having been shown and no obvious error appearing, we decline to consider this assignment of error.

We have considered the assignment of error with respect to the trial court's ruling excluding testimony of a district fisheries supervisor relating to the stocking of fish by the state in Five Lake, but in view of the theory upon which petitioner tried and submitted its case to the trial court, we find no grounds for reversible error presented.

Although respondent contends that petitioner failed to establish the other prerequisites to condemnation proceedings under M. S. A. 97.48, subd. 15, besides the requirement of the right of the public to hunt and fish, it becomes unnecessary to consider these contentions in view of our disposition of this appeal.

Affirmed.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.