# STATE v. E. A. H.
## ELNORA NEWMAN, APPELLANT.[1]

February 3, 1956.

No. 36,547.

[1]Reported in 75 N. W. (2d) 195.

*Hall, Smith & Hedlund, Douglas Hall,* and *William S. Rosen,* for appellant.

*Benedict Deinard,* for respondent-defendant.

MURPHY, JUSTICE.

This is a paternity proceeding instituted against the defendant, E. A. H., by the county attorney of Hennepin County under M. S. A. 257.19 upon the complaint of Mrs. Elnora Newman, as mother and natural guardian of her child, who is alleged to be the daughter of the defendant. A jury was waived and upon trial to the court the defendant was found not guilty. The state moved for a new trial on the ground that the findings of the court were not justified by the evidence. From an order denying this motion, the complainant, Mrs. Newman, appeals.

This controversy involves the complainant, her present husband, and the defendant, who the complainant asserts is the father of her child. The complainant was born in 1923 and was first married in September of 1942. Shortly after this marriage her former husband went overseas to war, and it was not until some three years later that she again saw him while she was serving in the Women's Auxiliary Corps in Washington, D. C. Pursuant to a discussion at that time divorce proceedings were subsequently instituted and the decree was entered in December of 1946. While the divorce proceedings were pending, and while she was living in Minneapolis, she met her present husband. They went out together a number of times until he left for his home at Deer River, Minnesota, in May of 1946. He lived in Deer River until November 15, 1947, and during this period he continued to see the complainant on visits to Minneapolis. His trips to Minneapolis in 1947 were more frequent.

It appears from the record that in the latter part of 1946 and the early part of 1947 the complainant went out with two other men friends. She admitted to having had sexual relations with them. In April of 1947 she met the defendant at a Friendship Club dance, and from that point on she was in his company on an average of two or three times a week up until Christmas of 1947. During the summer of 1947 they met almost every day.

The trial court found that the complainant had sexual relations with the defendant in each of the months of June through December of 1947 and probably in January of 1948. The court also found and the complainant admits that she had sexual relations with her husband on September 11, 1947, and that he had access to her on at least one other occasion in July of 1947. The child was born on May 17, 1948.

The complainant consulted a physician on July 30 or 31 of 1947 but the purpose of that visit is not made clear. Because of the inadequate records kept by the physician, it was impossible to ascertain the date of conception. The first examination by the doctor was followed by three more examinations in the month of September, and there was some testimony to the effect that the doctor "thought she was pregnant" on September 16.

On November 15, 1947, Newman left his home at Deer River, Minnesota, to go to California and stopped en route at Minneapolis to visit the complainant. The complainant and her present husband exchanged correspondence thereafter. In the early part of January 1948, the complainant drove as a passenger to Kansas City with the defendant and another man who were on their way to Florida. The complainant's purpose in going to Kansas City was apparently to enter a home for unwed mothers. The defendant denied any knowledge of this plan and claimed that she told him that she was to go to California "to find the man that had made her pregnant."

Two days after her arrival in Kansas City she boarded a plane for Los Angeles where she contacted Newman and told him that she was going to have a baby. She said nothing at the time to indicate to Newman that he was not the father. He agreed to marry her, and

after she made a trip back to Kansas City to pick up her clothes, they were married in Los Angeles on January 31, 1948. The complainant and her husband apparently have lived in harmony since that time. The birth certificate indicated that William Henry Newman was the father of the child and he had no objection to its being so stated. When the child was a year and a half old the complainant took the child to Minnesota so that her people might see it, and at that time it was baptized. The baptismal record represented that Newman was the father of the child. The complainant and her husband are now residents of California where they live with the child who is being raised as their own. There has been no suggestion to the child, who is now seven years of age, that Newman is not her father.

In May of 1953, the complainant and the child came to Minnesota for a vacation. Prior to leaving California she wrote to the defendant in Minneapolis advising of her expected arrival and intimating that she wanted financial assistance. After her arrival, she made arrangements to see the defendant at which time she asked him for money. They had several subsequent meetings on which occasions their former illicit conduct was renewed. There was evidence that she continued to press him for money and that he gave her small sums from time to time. On September 3, 1953, the complainant made a demand upon the defendant through her attorney. About this time Newman, who had arrived in Minneapolis to get his wife, learned that she had been making demands on the defendant and that she had been seeing him. Disturbed at his wife's conduct, Newman made arrangements to see the defendant at a local hotel during which meeting Newman told the defendant he believed the child to be the defendant's and that the defendant should leave Mrs. Newman alone in the future. The defendant denied he was the father and stated that he had only renewed the relationship because he thought the complainant had been divorced from Newman.

The Newmans returned to California in the middle of September 1953, and on January 13, 1954, Mrs. Newman returned to Minneapolis to file a complaint against the defendant with the county

attorney. Proceedings were started in the District Court of Hennepin County for the purpose of having the defendant adjudged to be the father of the complainant's child. Prior to the trial, blood tests were taken of the complainant, the child, and the defendant, but since the trial court was assured by counsel that the results of the tests were not in any way conclusive, they were not offered as evidence. The trial court found the defendant not guilty on May 18, 1954, and judgment was entered on June 18, 1954.

The county attorney's motion for a new trial on the ground of "Material evidence, newly discovered, which with reasonable diligence could not have been produced at the trial" was based upon the statement by a Los Angeles doctor that a blood test had been taken of William Newman's blood and compared to the reported tests of the blood of Elnora and the child, and that on the basis of this comparison he concluded Newman could not have been the father of the child. The motion also asserted that a finding of guilt was justified by the evidence. The motion was denied in its entirety on September 17, 1954, and thereafter Elnora, without the assistance of the county attorney, pursued an appeal to this court.

■ The defendant-respondent has moved that the appeal be dismissed on the ground that the complainant has no right to appeal in her capacity " 'as mother and natural guardian' of her minor child, or otherwise, from the order of the trial court denying the State's motion for a new trial." Respondent recognizes the fact that this court held in State v. Sax, 231 Minn. 1, 4, 42 N. W. (2d) 680, 682, by a four-to-three decision, that the mother of a child in a paternity proceeding had a "definite personal financial interest in the amount of the award for support" and thus as an aggrieved party had the right of appeal under M. S. A. 605.09. He urges, however, that the holding be overturned because the decision is allegedly unsound; that a change in the membership of the court warrants a reexamination of the case; and that, because of the facts in this case, the rule in the Sax case should be distinguished.

It should be pointed out that the doctrine of stare decisis requires this court to follow previous decisions in the absence of manifest

error.[2] We have recognized that former decisions of any court "must be discarded when they can no longer be adapted to changed conditions of society."[3] We recognize no reasons which would warrant a departure from the rule of stare decisis as it relates to the subject of paternity suits, nor should it be assumed that this court as now constituted will overrule its prior decisions without compelling reasons.

In distinguishing the Sax case, the respondent points out that in that case the guilt of the putative father had already been established and the point at issue was only the amount of the support award, whereas in the case before us the issue involves the alleged guilt of the putative father. The respondent urges that the mother in the present situation does not have such a "personal financial interest" in the defendant's guilt or innocence as to be an aggrieved party entitled to appeal under § 605.09. This appears to us as a distinction without a significant difference. We said in the Sax case (231 Minn. 4, 42 N. W. [2d] 682):

"* * * She [the mother] has a right in the proceeding to recover her lying-in expenses and the expense of support of the child prior to the judgment. Her secondary responsibility for support gives her a direct interest in the amount of the award against the father, whose responsibility is primary. Should the award be insufficient for the child's support, the burden of her secondary responsibility would be correspondingly increased, and, as natural guardian of her child, she is the person most interested in protecting its rights and interests."

Our holding here is limited only to the mother's right to appeal. Although the question of support for the child is not at the present time in issue, this fact does not remove from consideration the underlying pecuniary interest of the mother in the proceeding. If her secondary responsibility for support of the child gives her a direct

[2]American Auto. Ins. Co. v. Melling, 239 Minn. 74, 87, 57 N. W. (2d) 847, 855.

[3]Johnson v. Chicago, B. & Q. R. Co. 243 Minn. 58, 70, 66 N. W. (2d) 763, 771.

interest in the amount of the award, as we held in the Sax case, the same reason gives her a direct interest in determining the primary question as to who is father of the child. The determination of guilt is a prerequisite to the order for support. Section 257.19 provides that upon complaint of a mother and after the filing of the complaint' with the court "The county attorney may then bring the defendant before the judge of the court at any time for the adjudication of the paternity of such child *and the making of an order for its support."* (Italics supplied.) The statutory scheme of §§ 257.19 to 257.33 is not merely to establish paternity but to protect the child and shield the mother and public from the financial burdens incident to bastardy. Thus it was said in State v. Jeffrey, 188 Minn. 476, 479, 247 N. W. 692, 693, that—

"* * * The statute imposes a natural and moral duty—a threefold duty:

"(1) The father's duty to the mother, to whom he owes more than gratitude, since by his conduct he has in a measure contributed to her social ostracism and the impairment of her earning power;

"(2) The father's duty to his own child; and

"(3) The father's duty to protect the public against the child's becoming a public charge."

It is through the paternity statute that the financial responsibility of providing for the child is lifted from the mother or the state, if need be, and placed upon the father. Moreover, after judgment of paternity, the mother under § 257.24 is entitled to recover "all expense necessarily incurred by her in connection with her confinement." For these reasons, and more particularly for the reasons spelled out in the Sax case which holds that the mother must be deemed to have sufficient, direct pecuniary interest to give her the right to appeal under § 605.09, we hold the respondent's motion to dismiss the appeal should be denied.

The appellant contends that the finding of not guilty by the trial court is not justified by the evidence. In considering this issue we recognize the uniformly conceded principle that a child born to

a married woman during wedlock is presumed to be the child of her then husband.[4] We come to the question of how conclusive such a presumption should be.

The case of Haugen v. Swanson, 219 Minn. 123, 16 N. W. (2d) 900, involved a suit by a mother against her divorced husband for the purpose of compelling him to contribute to the support of the child and to reimburse the plaintiff. We held that, in the absence of a situation where at least all reasonable probability of the husband's parenthood is excluded, the presumption of legitimacy of a child conceived during a period when husband and wife were living together is conclusive. It was noted that this presumption could be rebutted only by proof of nonaccess of the husband during the possible period of gestation,[5] or conceivably through such scientific evidence as proof of miscegenation, impotency, or negative results of reliable blood tests by impartial physicians.[6] The reason for such a holding was stated as follows (219 Minn. 127, 16 N. W. [2d] 902):

"* * * A proper respect for the sanctity of the marital relationship requires that the presumption of legitimacy be conclusive under such circumstances, except in the exceptional situations we have noted. The legitimacy of a child born to a married woman should not be permitted to totter because of the willingness of the husband to deny normal sexual conduct during a period in which they admittedly lived under the same roof and were alone except for the presence of their minor children."

Whereas the Haugen case dealt with a situation in which conception occurred during wedlock, the case before us involves a situation of premarital conception with subsequent birth during wedlock. It is recognized, however, that conception during wedlock is not essential in order for the presumption of legitimacy which arises from a birth

[4] 9 Wigmore, Evidence (3 ed.) § 2527.

[5] See, State v. Soyka, 181 Minn. 533, 233 N. W. 300.

[6] As to the admissibility of evidence of paternity when the presumption is applicable, see Meemken v. O'Hara, 243 Minn. 138, 144, 66 N. W. (2d) 601, 605.

occurring in wedlock to come into play.[7] This is particularly true if the husband knew at the time of the marriage that his wife-to-be was pregnant, as is the case here. Thus in State v. Shoemaker, 62 Iowa 343, 344, 17 N. W. 589, the Iowa Supreme Court said:

"* * * One who marries a woman known by him to be *enceinte* is regarded by the law as adopting into his family the child at its birth. He could not expect that the mother upon its birth would discard the child and refuse to give it nurture and maintenance. The law would forbid a thing so unnatural. The child, receiving its support from the mother, must of necessity become one of her family, which is equally the family of the husband. The child, then, is received into the family of the husband, who stands as to it in *loco parentis*. This being the law, it enters into the marriage contract between the mother and the husband. When this relation is established, the law raises a conclusive presumption that the husband is the father of his wife's illegitimate child."

Also see, Miller v. Anderson, 43 Ohio St. 473, 3 N. E. 605; Phillips v. State ex rel. Hathcock, 82 Ind. App. 356, 145 N. E. 895. And in Hudson v. Hudson, 151 Neb. 210, 215, 36 N. W. (2d) 851, 855, the Nebraska Supreme Court said:

"When, as here, the husband admits he had intercourse with the wife before their marriage and within the probable period of gestation of the child which is conceived before but born after the marriage and he is informed of the pregnancy prior thereto he cannot deny its paternity but must submit to the marriage and the presumed paternity of the child."

Although a few jurisdictions have apparently taken the view that the presumption is weakened through proof of premarital conception,[8] we agree with the majority of the courts in holding the presumption to be just as strong as that in the situation found in the Haugen case, especially where the husband was aware of his wife's

[7]See, Annotation, 8 A. L. R. 427; Ervin v. Bass, 172 Miss. 332, 160 So. 568.

[8]See, 7 Am. Jur., Bastards, § 45.

pregnancy before marriage and there is proof that he had intercourse with the mother during the possible period of conception.

Appellant also asserts that the findings of fact upon which the presumption rests are not justified by the evidence and in so doing attacks findings 4 and 5 in which the trial court found that the complainant's husband had intercourse with her during the possible and probable period of conception and that there was no proof that she became pregnant prior to September 11, 1947, the admitted date of intercourse with the husband. We must be guided by the rule that findings of fact may not be set aside unless clearly erroneous, and consideration must be given to the trial court's opportunity to judge the credibility of the witnesses.[9]

Assuming conception occurred on September 11, 1947, and granting that the birth took place on May 17, 1948, the period of gestation would be about 248 days or approximately eight months. On the stand the complainant's doctor testified on cross-examination as follows:

"Q. Not having seen this child at birth, you have no way of determining, have you, whether the period of gestation was 8 months, 9 months, or 10 months?

"A. No, I haven't.

"Q. Any one of them would be normal, wouldn't it?

"A. *Yes, I think it would come in the category of normal, because I have quite a few 8 months babies that are perfectly all right and normal,* and I also have some that go over 2 or 3 weeks and a month, and they seem to be perfectly normal.

"Q. In other words, Doctor, in order to make an average you have to count in all the extremes at either limit?

"A. That's right.

"Q. *And the tolerance of a normal period of gestation is anywhere from 8 months to 10 months, isn't it?*

"A. *Yes, it could be, that is true.*" (Italics supplied.)

---

[9] Rule 52.01 of Rules of Civil Procedure; State, by Burnquist, v. Bollenbach, 241 Minn. 103, 109, 63 N. W. (2d) 278, 283; Sommers v. City of St. Paul, 183 Minn. 545, 551, 237 N. W. 427, 430.

We conclude that there is sufficient evidence in the record to sustain the court's finding on the period of conception. Moreover, the trial court's refusal to find that complainant was pregnant prior to September 11, 1947, cannot be altered in light of the fact that the doctor's records were so meager and incomplete as to be of very little assistance in determining the date of conception. Most of the information contained in the doctor's records had been added in preparation for the trial, which fact detracted from their value. Since the findings of fact are not clearly erroneous, they are found to be justified by the evidence.[10]

■ The appellant contends that the trial court abused its discretion in failing to grant a new trial on the ground that "material evidence, newly discovered, which with reasonable diligence could not have been found and produced at the trial" established that the husband could not have been the father of the child conceived by the complainant. This motion was supported by the affidavit of a California doctor which recited that on June 3, 1954, William Henry Newman appeared at the laboratories of the Hospital of the Good Samaritan in Los Angeles and furnished a specimen of his blood; that the doctor compared the results of an examination of that blood with the results of tests of the complainant's and the child's blood which were obtained elsewhere and transmitted to the doctor for comparison; and that by this comparison he came to the conclusion that the husband Newman could not be the father of the child. The appellant contends that this affidavit establishes with scientific certainty that Elnora was pregnant previous to September 11, 1947, and therefore rebuts the presumption of legitimacy.

This motion was addressed to the sound discretion of the trial court. We are concerned with whether the refusal to grant a new trial constituted a denial of a legal right or a manifest abuse of judicial discretion.[11] We are not prepared to declare that a blood

---

[10]See footnote 9, *supra*.

[11]Albertson v. Albertson, 243 Minn. 212, 67 N. W. (2d) 463; Austin v. Rosecke, 240 Minn. 321, 61 N. W. (2d) 240; Skog v. Pomush, 219 Minn. 322, 17 N. W. (2d) 641; 14 Dunnell, Dig. (3 ed.) § 7125.

test of only one of the parties involved, taken in California and compared with results of blood tests of other parties taken "elsewhere," is sufficient justification to warrant a new trial. Moreover, it is not clear from the doctor's affidavit as to who actually carried out the test of Newman's specimen or even if the tests were conducted under the supervision of the affiant. A new trial cannot be granted merely on the basis of hearsay.[12]

Newly discovered evidence cannot be the grounds for a new trial if it could have been discovered before the trial by use of reasonable diligence. At the trial the court asked each counsel if blood tests had been taken and was assured by them that tests were taken and that nothing of benefit could be gained from the results of the tests. To now permit a new trial on the basis of a further blood test which it is claimed excludes the husband but does not conclusively show the defendant's guilt would not only be an unnecessary imposition upon the courts but would also overlook the interests of a seven-year-old child whom the appellant mother is attempting to illegitimize. In view of the defendant's conduct it may be assumed that the court searched the record conscientiously to determine if the evidence therein would support a finding of guilty. We conclude that the trial court did not abuse its discretion in denying the motion for a new trial on the basis of newly discovered evidence.

■   The appellant points to the fact that the trial judge in his memorandum stated "Clear and convincing proof is required to convict," and that "That degree of proof was certainly not established here." She contends that the correct degree of proof to be applied in a paternity case is a "fair preponderance of the evidence." See, State v. Becker, 231 Minn. 174, 42 N. W. (2d) 704. It is true that the measure of proof is the fair preponderance measure, however, where the testimony of the plaintiff is uncorroborated, it is her *testimony* which must be clear and convincing.[13]

From the record before us it does not affirmatively appear that this point was urged in the motion for a new trial which contained

[12]Donea v. Massachusetts Mut. L. Ins. Co. 220 Minn. 204, 216, 19 N. W. (2d) 377, 384; Peterson v. Skarp, 117 Minn. 102, 134 N. W. 503.

[13]2 Dunnell, Dig. (3 ed.) §§ 836 to 838.

only two grounds: namely, newly discovered evidence and that the findings and decision were not justified by the evidence. Because this court is fundamentally an appellate court, it can only review on appeal those questions which have been presented previously to the trial court so that it might have an opportunity to correct any error.[14] Assuming, however, that the issue was properly presented, the record before us compels the conclusion that the trial court's decision was right as a matter of law and in accordance with the weight and sufficiency of the evidence.[15] Moreover, the statement referred to in the trial court's memorandum may be disregarded as it is not a part of his findings.[16]

Affirmed.

---

[14]Rodbacken v. Chicago, M. & St. P. Ry. Co. 161 Minn. 514, 200 N. W. 747; Gordon v. Pappas, 227 Minn. 95, 100, 34 N. W. (2d) 293, 296.

[15]Riebel v. Mueller, 177 Minn. 602, 604, 225 N. W. 924, 925, 66 A. L. R. 1.

[16]Johnson v. Johnson, 223 Minn. 420, 427, 27 N. W. (2d) 289, 293; Bicanic v. J. C. Campbell Co. 220 Minn. 107, 19 N. W. (2d) 7. E.g., Minneapolis Gaslight Co. v. City of Minneapolis, 123 Minn. 231, 242, 143 N. W. 728, 732.